Gregory L. Curtner (GC 5395)
Susan I. Robbins (GC 5759)
MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
500 Fifth Avenue, Suite 1815
New York, NY 10110
Telephone: (212) 704-4400

Attorneys for Intervenor

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

— — — — — — — — — — — — — — — — — — — — — — — —

| | |
|---|---|
| HIGHLAND PARK CDO I GRANTOR TRUST, SERIES A,<br><br>        Plaintiff,<br><br>v.<br><br>MATTHEW STUDER, FRED GRAFT, ERNIE MALAS, AND PETER CORATOLA,<br><br>        Defendants. | Civil Action No. 08 CV 01670<br><br>Hon. Naomi Reice Buchwald<br><br>**DECLARATION OF GREGORY L. CURTNER IN SUPPORT OF SENIOR LENDER'S MOTION TO INTERVENE AND TO DISMISS PLAINTIFF'S COMPLAINT** |

— — — — — — — — — — — — — — — — — — — — — — — —

1.    I, Gregory L. Curtner, declare as follows under penalty of perjury:

2.    I am an attorney duly licensed in the State of New York and admitted to the bar of this Court.  I am an attorney at the law firm of Miller, Canfield, Paddock and Stone, P.L.C., counsel for Intervenor Wells Fargo Bank, N.A., as Trustee for the Morgan Stanley Capital I Inc. Commercial Mortgage Pass-Through Certificates Series 2006-XLF (the "Senior Lender") acting through Midland Loan Services, Inc., in its capacity as Special Servicer of the Trust.  I make this declaration in support of the Senior Lender's motion to intervene as a Defendant in this action and motion to dismiss the Complaint of Plaintiff Highland Park CDO I Grantor Trust, Series A (the "Mezzanine Lender").

3.      Fed. R. Civ. P. 24(a)(2) provides that the Court must permit a party to intervene who claims an interest relating to the property that is the subject of the action, and is so situated that disposing of the action without that party may as a practical matter impair or impede the movant's ability to protect its interests and the existing parties do not adequately represent that interest.

4.      In the alternative, Fed. R. Civ. P. 24(b)(1)(B) provides that the Court may permit a party to intervene who has a claim that shares with the main action a common question of law or fact.

5.      The Complaint alleges a debt collection action by the Mezzanine Lender against four Guarantors of the Mezzanine Loan.  Complaint ¶¶ 1-2.

6.      The four Guarantors are also Guarantors of a related loan, relating to the same hotel property in Columbus, Ohio, by the Senor Lender and there is pending in the Court of Common Pleas of Franklin County, Ohio an action against the Guarantors by the Senior Lender. The Senior Loan Guaranty and the Court of Common Pleas complaint are attached hereto as Exhs. A and B.  Allowing the present action to proceed to judgment without the intervention of the Senior Lender creates the possibility of inconsistent adjudication of common issues by this Court and the Court of Common Pleas in Ohio.

7.      The Mezzanine Lender also entered into an Intercreditor Agreement with the Senior Lender that, for the reasons stated in the Memorandum of Law filed herewith, bars the Mezzanine Lender from the remedy and relief the Mezzanine Lender seeks herein.   The Intercreditor Agreement is attached hereto as Exh. C.

8.      The motion to dismiss of the Senior Lender presents questions of law and fact that are common to this action and the defenses raised by the Senior Lender in the motion to dismiss

cannot be raised by the Guarantors or cannot be raised by them as effectively as by the Senior Lender.

9.     The Senior Lender respectfully requests that this Honorable Court permit the Senior Lender to intervene, dismiss the Complaint of the Mezzanine Lender, award the Senior Lender its costs and attorney fees as provided in the Intercreditor Agreement, and grant the Senior Lender such other and further relief as is just and equitable.

Dated:  New York, New York
        June 10, 2008

                         Respectfully submitted,

                         MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

                         By:  s/Gregory L. Curtner
                                Gregory L. Curtner (GC 5395)
                                Counsel for Intervenor Wells Fargo Bank, N.A., as Trustee
                                for the Morgan Stanley Capital I Inc. Commercial
                                Mortgage Pass-Through Certificates Series 2006-XLF
                                Miller, Canfield, Paddock and Stone, P.L.C.
                                500 Fifth Avenue, Suite 1815
                                New York, New York 10110
                                Telephone: (212) 704-4400
                                Email: curtner@millercanfield.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2008, I electronically filed the foregoing paper with the Clerk of the court using the ECF system, which will send notification of such filing to the following:

Michael T. Stolper, Esq. mstolper@orrick.com;

Dennis Michael O'Bryan, Esq. dob@obryanlaw.net;

Yasmin Rukhshanda Saeed, Esq. ysaeed@bkgllplaw.com; and

Marc J. Kessler, Esq. mkessler@hahnlaw.com

s/Gregory L. Curtner
Gregory L. Curtner (GC 5395)
Counsel for Intervenor Wells Fargo Bank, N.A., as Trustee for the Morgan Stanley Capital I Inc. Commercial Mortgage Pass-Through Certificates Series 2006-XLF
Miller, Canfield, Paddock and Stone, P.L.C.
500 Fifth Avenue, Suite 1815
New York, New York 10110
Telephone: (212) 704-4400
Email: curtner@millercanfield.com

DELIB:2974114.3\131318-00022

## INDEX OF EXHIBITS

**EXHIBIT**

A    Senior Loan Guaranty

B    Court of Common Pleas complaint

C    Intercreditor Agreement

# GUARANTY OF PAYMENT AND GUARANTY OF RECOURSE OBLIGATIONS OF BORROWER

FOR VALUE RECEIVED, and to induce **MORGAN STANLEY MORTGAGE CAPITAL INC.**, a New York corporation, having an address at 1221 Avenue of the Americas, New York, New York 10020 ("**Lender**"), to lend to **PLATINUM LODGING, LLC**, an Ohio limited liability company ("**Borrower**"), whose principal place of business is 4560 Hilton Corporate Drive, Columbus, Ohio 43232, the principal sum of TWENTY-EIGHT MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($28,500,000.00) (the "**Loan**"), evidenced by a certain promissory note (the "**Note**") and a certain loan agreement (the "**Loan Agreement**") and secured by a certain mortgage and security agreement (the "**Security Instrument**"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Loan Agreement.

1.      As of this 18th day of July, 2006, the undersigned, **MATTHEW STUDER** having an address at 4130 Daventry Road, Columbus, Ohio 43220, **FRED GRAFT** having an address at 1123 Worthington Heights, Columbus, Ohio 43235, **ERNIE MALAS** having an address at 2481 Stonehaven Place, Columbus, Ohio 43220 and **PETER CORATOLA** having an address at 8330 Strasbourg Court, Dublin, Ohio 43017 (hereinafter collectively referred to as "**Guarantor**"), jointly and severally hereby absolutely and unconditionally guarantee to Lender the prompt and unconditional payment of (i) the Debt (as defined below) and (ii) the Guaranteed Recourse Obligations of Borrower (as defined below).

2.      It is expressly understood and agreed that this is a continuing guaranty and that the obligations of Guarantor hereunder are and shall be absolute under any and all circumstances, without regard to the validity, regularity or enforceability of the Note, the Security Instrument, the Loan Agreement or the other Loan Documents, a true copy of each of said documents Guarantor hereby acknowledges having received and reviewed.

3.      The term "**Debt**" as used in this Guaranty of Payment and Guaranty of Recourse Obligations of Borrower (this "**Guaranty**") shall mean the principal sum evidenced by the Note and the Loan Agreement, and secured by the Security Instrument, or so much thereof as may be outstanding from time to time, together with interest thereon at the rate of interest specified in the Note and all other sums other than principal or interest which may or shall become due and payable pursuant to the provisions of the Note, the Security Instrument, the Loan Agreement or the other Loan Documents, including without limitation, (i) all penalties and late charges on such obligations to the extent provided for in the Loan Agreement, the Note, the Security Instrument or the other Loan Documents (ii) all real estate taxes or assessments or payments in lieu thereof and all other operating expenses relating to the Property, (iii) all reasonable legal and other costs or expenses paid or incurred by or on behalf of Lender in the enforcement of the Loan Agreement, the Note, the Security Instrument, the other Loan Documents or this Guaranty.

4.     The term **"Guaranteed Recourse Obligations of Borrower"** as used in this Guaranty shall mean all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Section 11.22 of the Loan Agreement.

5.     Any indebtedness of Borrower to Guarantor now or hereafter existing (including, but not limited to, any rights to subrogation Guarantor may have as a result of any payment by Guarantor under this Guaranty), together with any interest thereon, shall be, and such indebtedness is, hereby deferred, postponed and subordinated to the prior payment in full of the Debt.  Until payment in full of the Debt (and including interest accruing on the Note after the commencement of a proceeding by or against Borrower under the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. Sections 101 et seq., and the regulations adopted and promulgated pursuant thereto (collectively, the **"Bankruptcy Code"**) which interest the parties agree shall remain a claim that is prior and superior to any claim of Guarantor notwithstanding any contrary practice, custom or ruling in cases under the Bankruptcy Code generally), Guarantor agrees not to accept any payment or satisfaction of any kind of indebtedness of Borrower to Guarantor and hereby assigns such indebtedness to Lender, including the right to file proof of claim and to vote thereon in connection with any such proceeding under the Bankruptcy Code, including the right to vote on any plan of reorganization.  Further, if Guarantor shall comprise more than one person, firm or corporation, Guarantor agrees that until such payment in full of the Debt, (a) no one of them shall accept payment from the others by way of contribution on account of any payment made hereunder by such party to Lender, (b) no one of them will take any action to exercise or enforce any rights to such contribution, and (c) if any of Guarantor should receive any payment, satisfaction or security for any indebtedness of Borrower to any of Guarantor or for any contribution by the others of Guarantor for payment made hereunder by the recipient to Lender, the same shall be delivered to Lender in the form received, endorsed or assigned as may be appropriate for application on account of, or as security for, the Debt and until so delivered, shall be held in trust for Lender as security for the Debt.

6.     Guarantor agrees that, with or without notice or demand, Guarantor will reimburse Lender, to the extent that such reimbursement is not made by Borrower, for all expenses (including counsel fees) incurred by Lender in connection with the collection of the Guaranteed Recourse Obligations of Borrower or any portion thereof or with the enforcement of this Guaranty.

7.     All moneys available to Lender for application in payment or reduction of the Debt may be applied by Lender in such manner and in such amounts and at such time or times and in such order and priority as Lender may see fit to the payment or reduction of such portion of the Debt as Lender may elect.

8.     Guarantor hereby waives notice of the acceptance hereof, presentment, demand for payment, protest, notice of protest, or any and all notice of non-payment, non-performance or non-observance, or other proof, or notice or demand, whereby to charge Guarantor therefor.

9.     Guarantor further agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected or impaired (a) by reason of the assertion by Lender of any rights or remedies which it may have under or with respect to either the Note, the Security Instrument, the Loan Agreement or the other Loan Documents, against

any person obligated thereunder or against the owner of the Property (as defined in the Security Instrument), or (b) by reason of any failure to file or record any of such instruments or to take or perfect any security intended to be provided thereby, or (c) by reason of the release or exchange of any property covered by the Security Instrument or other collateral for the Loan, or (d) by reason of Lender's failure to exercise, or delay in exercising, any such right or remedy or any right or remedy Lender may have hereunder or in respect to this Guaranty, or (e) by reason of the commencement of a case under the Bankruptcy Code by or against any person obligated under the Note, the Security Instrument, the Loan Agreement or the other Loan Documents, or the death of any Guarantor, or (f) by reason of any payment made on the Debt or any other indebtedness arising under the Note, the Security Instrument, the Loan Agreement or the other Loan Documents, whether made by Borrower or Guarantor or any other person, which is required to be refunded pursuant to any bankruptcy or insolvency law; it being understood that no payment so refunded shall be considered as a payment of any portion of the Debt, nor shall it have the effect of reducing the liability of Guarantor hereunder. It is further understood, that if Borrower shall have taken advantage of, or be subject to the protection of, any provision in the Bankruptcy Code, the effect of which is to prevent or delay Lender from taking any remedial action against Borrower, including the exercise of any option Lender has to declare the Debt due and payable on the happening of any default or event by which under the terms of the Note, the Security Instrument, the Loan Agreement or the other Loan Documents, the Debt shall become due and payable, Lender may, as against Guarantor, nevertheless, declare the Debt due and payable and enforce any or all of its rights and remedies against Guarantor provided for herein.

10.    Guarantor further covenants that this Guaranty shall remain and continue in full force and effect as to any modification, extension or renewal of the Note, the Security Instrument, the Loan Agreement or any of the other Loan Documents, that Lender shall not be under a duty to protect, secure or insure any security or lien provided by the Security Instrument or other such collateral, and that other indulgences or forbearance may be granted under any or all of such documents, all of which may be made, done or suffered without notice to, or further consent of, Guarantor.

11.    As a further inducement to Lender to make the Loan and in consideration thereof, Guarantor further covenants and agrees (a) that in any action or proceeding brought by Lender against Guarantor on this Guaranty, Guarantor shall and does hereby waive trial by jury, (b) Guarantor will maintain a place of business or an agent for service of process in the State of New York (the "**State**") and give prompt notice to Lender of the address of such place of business and of the name and address of any new agent appointed by it, as appropriate, (c) the failure of Guarantor's agent for service of process to give it notice of any service of process will not impair or affect the validity of such service or of any judgment based thereon, (d) if, despite the foregoing, there is for any reason no agent for service of process of Guarantor available to be served, and if Guarantor at that time has no place of business in the State then Guarantor irrevocably consents to service of process by registered or certified mail, postage prepaid, to it at its address given in or pursuant to the first paragraph hereof, Guarantor hereby waiving personal service thereof, (e) that within thirty days after such mailing, Guarantor so served shall appear or answer to any summons and complaint or other process and should Guarantor so served fail to appear or answer within said thirty-day period, said Guarantor shall be deemed in default and judgment may be entered by Lender against the said party for the amount as demanded in any summons and complaint or other process so served, (f) Guarantor initially and irrevocably

designates CT Corporation System with offices on the date hereof at 111 Eighth Avenue, New York, NY 10011 to receive for and on behalf of Guarantor service of process in the State with respect to this Guaranty, (g) with respect to any claim or action arising hereunder, Guarantor (i) irrevocably submits to the nonexclusive jurisdiction of the courts of the State and any United States District Court located in the State, and appellate courts from any thereof, and (ii) irrevocably waives any objection which it may have at any time to the laying on venue of any suit, action or proceeding arising out of or relating to this Guaranty brought in any such court, irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum, and (h) nothing in this Guaranty will be deemed to preclude Lender from bringing an action or proceeding with respect hereto in any other jurisdiction.

12.     This is a guaranty of payment and not of collection and upon any default of Borrower under the Note, the Security Instrument, the Loan Agreement or the other Loan Documents, Lender may, at its option, proceed directly and at once, without notice, against Guarantor to collect and recover the full amount of the liability hereunder or any portion thereof, without proceeding against Borrower or any other person, or foreclosing upon, selling, or otherwise disposing of or collecting or applying against any of the mortgaged property or other collateral for the Loan.  Guarantor hereby waives the pleading of any statute of limitations as a defense to the obligation hereunder.

13.     Each reference herein to Lender shall be deemed to include its successors and assigns, to whose favor the provisions of this Guaranty shall also inure.  Each reference herein to Guarantor shall be deemed to include the heirs, executors, administrators, legal representatives, successors and assigns of Guarantor, all of whom shall be bound by the provisions of this Guaranty.

14.     If any party hereto shall be a partnership, the agreements and obligations on the part of Guarantor herein contained shall remain in force and application notwithstanding any changes in the individuals composing the partnership and the term "Guarantor" shall include any altered or successive partnerships but the predecessor partnerships and their partners shall not thereby be released from any obligations or liability hereunder.

15.     Guarantor (and its representative, executing below, if any) has full power, authority and legal right to execute this Guaranty and to perform all its obligations under this Guaranty.

16.     All understandings, representations and agreements heretofore had with respect to this Guaranty are merged into this Guaranty which alone fully and completely expresses the agreement of Guarantor and Lender.

17.     This Guaranty may be executed in one or more counterparts by some or all of the parties hereto, each of which counterparts shall be an original and all of which together shall constitute a single agreement of Guaranty.  The failure of any party hereto to execute this Guaranty, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

18.    This Guaranty may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Lender or Borrower, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

19.    This Guaranty shall be deemed to be a contract entered into pursuant to the laws of the State and shall in all respects be governed, construed, applied and enforced in accordance with applicable federal law and the laws of the State, without reference or giving effect to any choice of law doctrine.

20.    Guarantor hereby covenants and agrees as follows:

(a)    Guarantor shall at all times during the term of the Loan maintain a combined minimum Net Worth (as such term is hereinafter defined) of not less than $75,000,000.00 (excluding receivables from Affiliates (as defined in the Loan Agreement)), as determined by Lender.

(b)    Guarantor shall (i) from the date hereof and until such time as the Mezzanine Loan (as defined in the Loan Agreement) is entered into, maintain a combined minimum Liquidity (as such term is hereinafter defined) of not less than $1,500,000.00, as determined by Lender from time to time, and (ii) from the time the Mezzanine Loan is entered into, through and until the remainder of the term of the Loan, maintain a combined minimum Liquidity of not less than $5,000,000.00, as determined by Lender from time to time.

(c)    For all purposes of this Guaranty, except as otherwise expressly provided:

(i)    "Net Worth" shall mean, at any date of determination, an amount equal to the aggregate of (a) the total assets of each Guarantor determined in accordance with generally accepted accounting principals as modified by Lender's then-current underwriting criteria with assets valued at market values, *minus* (b) the total liabilities of each Guarantor determined in accordance with generally accepted accounting principals as modified by Lender's then-current underwriting criteria;

(ii)    "Liquidity" shall mean, for each Guarantor, (a) unencumbered Cash and Cash Equivalents (as such term is hereinafter defined) of such Guarantor, and (b) publicly-traded, marketable securities (valued in accordance with GAAP) of each Guarantor;

(iii)    "Cash and Cash Equivalents" shall mean all unrestricted or unencumbered (A) cash and (B) any of the following: (x) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by an agency thereof and backed by the full faith and credit of the United States; (y) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof which, at the time of acquisition, has one of the two highest ratings obtainable from any two (2) of S&P, Moody's or Fitch (or, if at any time no two of

5

the foregoing shall be rating such obligations, then from such other nationally recognized rating services as may be acceptable to Lender) and is not listed for possible down-grade in any publication of any of the foregoing rating services; (z) commercial paper of a corporation having a net worth of not less than $500,000,000.00, other than commercial paper issued by Borrower and/or Guarantor and/or any Affiliate of any of the foregoing which, at the time of acquisition, has a rating of at least either A-1+ or such comparable rating from S&P or Moody's, respectively; (aa) domestic certificates of deposit or domestic time deposits or repurchase agreements issued by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia having combined capital and surplus of not less than $1,000,000,000.00, which commercial bank has a rating of at least either "AA" or such comparable rating from S&P or Moody's, respectively; (bb) any funds deposited or invested by any Guarantor in accounts maintained with Lender and which are not held in escrow for, or pledged as security for, any obligations of Borrower and/or any Guarantor and/or any Affiliate of any of the foregoing; (cc) money market funds having assets under management in excess of $2,000,000,000.00 and/or (dd) any unrestricted stock, shares, certificates, bonds, debentures, notes or other instrument which constitutes a "security" under the Security Act of 1933 (other than any of the foregoing representative interests in Borrower and/or Guarantor and/or any Affiliate) which are freely tradeable on any nationally recognized securities exchange and are not otherwise encumbered by Guarantor; and

(iv) "Indebtedness" shall mean, as of any date of determination, with respect to any Guarantor, the aggregate sum of the following items, but only to the extent that such items a r e a personal "recourse" obligation of such Guarantor which can be satisfied out of assets of such Guarantor which have not been pledged as collateral therefor: (i) the unpaid principal balance of all indebtedness or liability for money borrowed or owed by any Guarantor from time to time (including any renewals, extensions and refinancings thereof), whether or not the indebtedness was heretofore or hereafter created, issued, incurred, assumed or guarantied; (ii) the unpaid principal balance of all indebtedness or liability for the deferred purchase price of property or services incurred (including trade obligations); (iii) all obligations as lessee under leases which have been or should be recorded as capitalized leases; (iv) all current obligations in respect of any unfunded vested benefits under any Plan covered by Title IV of ERISA; (v) all obligations, contingent or otherwise relative to the stated amount of all letters of credit issued for either of the Guarantor's account, whether or not drawn, to the extent such letters of credit are not collateralized with a mortgage on real estate, a pledge of other assets or cash or marketable securities in separate segregated pledged collateral accounts; (vi) all obligations arising under bankers' acceptance facilities issued for the account of any Guarantor; (vii) all guarantees and endorsements to provide

6

funds for payments or otherwise to assure a creditor against loss; and (viii) all obligations secured by any mortgage, lien, pledge, or security interest or other charge or encumbrance on property, but only if such obligations have been personally assumed by such Guarantor, and then, only to the extent such assumed obligations exceed the value of such collateral.

21.    Each Guarantor shall comply, as applicable, with the respective financial reporting requirements set forth in Section 4.1.6 of the Loan Agreement.

**[NO FURTHER TEXT ON THIS PAGE]**

**IN WITNESS WHEREOF,** Guarantor has duly executed this Guaranty as of the day and year first above written.

GUARANTOR:

_____
Matthew Studer, an individual

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

GUARANTOR:

_____
Ernie Malas, an individual

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

GUARANTOR:

_____
Fred Graft, an individual

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

GUARANTOR:

Peter Coratola, an individual

[NO FURTHER TEXT ON THIS PAGE]

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

WELLS FARGO BANK, N.A., AS TRUSTEE
FOR THE MORGAN STANLEY CAPITAL I
INC. COMMERCIAL MORTGAGE PASS-
THROUGH CERTIFICATES SERIES 2006-
XLF, by and through its Special Servicer
Midland Loan Services
10851 Mastin, Suite 300
Overland Park, KS 66210,

        Plaintiff,

        vs.

PLATINUM LODGING, LLC
c/o Peter L. Coratola
126 S. High Street
Dublin, OH 43017,

KEY EQUIPMENT FINANCE INC.
c/o CSC – Lawyers Incorporating Service
50 W. Broad St., Suite 1800
Columbus, OH 43215,

LODGENET ENTERTAINMENT CORP.
c/o The Prentice Hall Corporation System, Inc.
50 W. Broad St., Suite 1800
Columbus, OH 43215,

US BANCORP BUSINESS EQUIPMENT
FINANCE GROUP
c/o Lyon Financial Services, Inc.
1310 Madrid St.
Marshall, MN 56258,

GAYLOR, INC.
c/o CT Corporation System
1300 East Ninth Street
Cleveland, OH 44114,

CHAMPION SERVICES, LLC
c/o John A. Gleason
555 Metro Place North, Suite 600
Dublin, OH 43017,

Case No. 08CVE03-03668

Judge: Reece

**FIRST AMENDED COMPLAINT FOR
FORECLOSURE OF COMMERCIAL
MORTGAGE, APPOINTMENT OF
RECEIVER AND OTHER EQUITABLE
RELIEF**

GALLOWAY LANDSCAPE, LLC
c/o Acme Agent, Inc.
41 South High Street. Suite 2800
Columbus, OH 43215,

OHIO STATE BUREAU OF WORKER'S
COMPENSATION
30 W. Spring Street
Columbus, OH 43215,

GREENSCAPES LANDSCAPE COMPANY,
INC.
c/o John C. Albert
500 South Front Street
Columbus, OH 43215,

SCHINDLER ELEVATOR CORPORATION
c/o CT Corporation System
1300 East Ninth Street
Cleveland, OH 44114,

ALL-SEAL COATINGS, INC.
15515 West Third Street
Plymouth, IN 46563,

ECU STAFFING MULTI-SERVICES, INC.
c/o Guillermo Barrios
5578 Blue Lagoon Lane
Hilliard, OH 43026,

COLUMBUS WORTHINGTON HEATING
AND AIR CONDITIONING COMPANY INC
c/o CSC – Lawyers Incorporating Service
1300 East Ninth Street
Cleveland, OH 44114,

CRANE GROUP CO.
c/o Porter, Wright, Morris & Arthur LLP
Attn: James P. Botti
41 South High Street
Columbus, OH 43215

FRANKLIN COUNTY TREASURER
373 South High Street, 17th Floor
Columbus, OH 43215

MATTHEW STUDER
4181 Kenny
Columbus, OH 43220,

FRED GRAFT
1123 Worthington Heights
Columbus, OH 43235,

ERNIE MALAS
2481 Stonehaven Place
Columbus, OH 43220,

and

PETER CORATOLA
8330 Strasbourg Court
Dublin, OH 43017

                    Defendants.

_____

Wells Fargo Bank, N.A., as Trustee for the Morgan Stanley Capital I Inc. Commercial

Mortgage Pass-Through Certificates Series 2006-XLF (the "Plaintiff") acting through Midland

Loan Services, Inc., in its capacity as Special Servicer of the Trust, by and through its attorneys,

Miller, Canfield, Paddock and Stone, PLC, states:

## PARTIES

1. Plaintiff is a national banking association acting as Trustee, and having a place of

business at c/o Midland Loan Services, Inc., 10851 Mastin, Suite 300, Overland Park, KS 66210.

2. Defendant Platinum Lodging, LLC ("Platinum") is an Ohio limited liability company

owning property and conducting business in Franklin County, Ohio. Platinum's registered agent

is Peter L. Coratola having an office at 126 S. High Street, Dublin, OH 43017.

3. Upon information and belief, Defendant Matthew Studer ("Studer") is a resident of the

State of Ohio and has his principal residence at 4130 Daventry Road Columbus, OH 43220.

4. Upon information and belief, Defendant Fred Graft ("Graft") is a resident of the State of Ohio and has his principal residence at 1123 Worthington Heights Columbus, OH 43235.

5. Upon information and belief, Defendant Ernie Malas ("Malas") is a resident of the State of Ohio and has his principal residence at 2481 Stonehaven Place Columbus, OH 43220.

6. Upon information and belief, Defendant Peter Coratola ("Coratola") is a resident of the State of Ohio and has his principal residence at 8330 Strasbourg Court Dublin, OH 43017.

7. Upon information and belief, each other defendant has or claims to have an interest in all or part of the property at issue in this matter.

## GENERAL ALLEGATIONS

### Loan and Loan Documents

8. Platinum is the fee owner of the real property located at 4560 Hilton Corporate Drive, Columbus, Ohio 43232 and more particularly described in **Exhibit A**, attached (the "Property").

9. On or about July 18, 2006, Platinum entered into a commercial mortgage transaction with Morgan Stanley Mortgage Capital Inc. ("Morgan Stanley") in the original principal amount of $28,500,000.00 (the "Loan").

10. The loan documents ("Loan Documents") executed and delivered in connection with the Loan include, without limitation, the following:

a. A *Promissory Note* (the "Note") in the original principal amount of $28,500,000.00 dated July 18, 2006. A true and accurate copy of the Note is attached to Plaintiff's Complaint for Foreclosure of Commercial Mortgage, Appointment of Receiver and Other Equitable Relief (the "Complaint") as **Exhibit B**.

b. A *Mortgage and Security Agreement* (the "Mortgage") dated as of and recorded on July 18, 2006 as Franklin County Recorder's Instrument No. 200607180140554. A true and accurate copy of the Mortgage is attached to the Complaint as **Exhibit C**.

c. An *Assignment of Leases and Rents* (the "Assignment of Rents") dated and recorded on July 18, 2006 as Franklin Count Recorder's Instrument No. 200607180140555. A true and accurate copy of the Assignment of Rents is attached to the Complaint as **Exhibit D**.

d. A *Guaranty of Payment and Guaranty of Recourse Obligations of Borrower* (the "Guaranty") dated as of July 18, 2006 executed by Defendants Studer, Graft, Malas and Coratola. A true and accurate copy of the Guaranty is attached to the Complaint as **Exhibit E**.

e. A *Loan Agreement* dated July 18, 2006 executed by Morgan Stanley and Defendant Platinum. A true and accurate copy of the Loan Agreement is attached to the Complaint as **Exhibit F**.

f. A *First Amendment to the Loan Agreement* dated August 3, 2006 executed by Morgan Stanley and Defendant Platinum. A true and accurate copy of the First Amendment to the Loan Agreement is attached to the Complaint as **Exhibit G**.

g. An *Environmental Indemnity Agreement* dated as of July 18, 2006 executed by Defendants Platinum, Studer, Graft, Malas and Coratola. A true and accurate copy of the Environmental Indemnity Agreement is attached to the Complaint as **Exhibit H**.

h. A *UCC-1 Financing Statement* (the "Financing Statement") listing Platinum as debtor and Morgan Stanley as secured party filed July 18, 2006 as Ohio Secretary of

State File No. OH00104525188. A true and accurate copy of the Financing Statement is attached to the Complaint as **Exhibit I**.

i. A *UCC-1 Fixture Filing* (the "Fixture Filing") listing Platinum as debtor and Morgan Stanley as secured party filed July 18, 2006 as Franklin County Recorder's Instrument No. 200607180140556. A true and accurate copy of the Fixture Filing is attached to the Complaint as **Exhibit J**.

**Assignment to Plaintiff**

11. On or about August 16, 2006, Morgan Stanley assigned the Loan and Loan Documents to Plaintiff.

12. The documents by which Morgan Stanley assigned the Loan and Loan Documents to Plaintiff include, without limitation, the following:

a. An *Allonge* to the Note executed by Morgan Stanley, a true and accurate copy of which is attached to the Complaint as part of **Exhibit B**.

b. An *Assignment of Mortgage and Security Agreement* (the "Assignment of Mortgage") dated as of August 16, 2006 and recorded September 29, 2006 as Franklin County Recorder's Instrument No. 200609290194585. A true and accurate copy of the Assignment of Mortgage is attached to the Complaint as **Exhibit K**.

c. An *Assignment of Assignment of Leases and Rents* (the "Assignment of Assignment of Rents") dated as of August 16, 2006 and recorded September 29, 2006 as Franklin County Recorder's Instrument No. 200609290194588. A true and accurate copy of the Assignment of Assignment of Rents is attached to the Complaint as **Exhibit L**.

d. An *Omnibus Assignment* dated as of August 16, 2006 executed by Morgan Stanley. A true and accurate copy of the Omnibus Assignment is attached to the Complaint as **Exhibit M**.

e. A Financing Statement Assignment filed September 18, 2006 as Ohio Secretary of State File No. 20062610848. A true and accurate copy of the Financing Statement Assignment is attached to the Complaint as **Exhibit N**.

f. A Fixture Filing Assignment filed on September 29, 2006 as Franklin County Recorder's Instrument No. 200609290194591. A true and accurate copy of the Fixture Filing Assignment is attached to the Complaint as **Exhibit O**.

**Defaults and Receiver Provisions**

13. Platinum has defaulted under the terms of the Loan and Loan Documents. These defaults include, without limitation, the termination of the License Agreement between Platinum and Holiday Hospitality Franchising, Inc. in violation of section 10.1(a)(xvii), and the failure to pay the Loan in full upon its maturity on February 8, 2008.

14. Plaintiff provided Defendants with notice of the above defaults and demanded that all sums due under the Loan were immediately due and payable as evidenced by its letters dated February 6, 2008 and February 12, 2008, attached to the Complaint as **Exhibits P** and **Q** respectively.

15. The amount due on the Loan as of February 25, 2008 was as follows:

| | |
|---|---|
| Principal Balance | $24,500,000.00 |
| Interest | $      47,638.00 |
| Default Interest | $      51,041.67 |
| Bank Account Maintenance Fee | $             50.00 |
| Protective Advance – Inspection | $           832.53 |
| Exit Fee | $      712,500.00 |
| Total Amount Due | $25,312,063.09 |

plus any costs, expenses, advances and attorney fees incurred by Plaintiff.

16. The Property is income producing property, specifically a 338 room hotel and an indoor water park.

17. The Property has been unable to generate sufficient income to pay the mortgage indebtedness, and the Loan is in default.

18. Platinum granted Plaintiff the right to the appointment of a receiver to collect rents upon a default in the Loan Documents as follows:

> Lender shall be entitled to the appointment of a receiver of Lender's choice for the Property as a matter of right and without notice, which is hereby expressly waived, with power to collect the rents due and to become due, without regard to the value of the Property and regardless of whether Lender may have an adequate remedy at law or in equity. ***Borrower, for itself and its successors and assigns, hereby waives any and all defenses to the application for a receiver as set forth above, and hereby specifically consents to such appointment of a receiver of Lender's choice in any event in ex parte proceedings and without notice.***

*See* **Exhibit C**, § 16.5 (emphasis supplied).

## COUNT I
### Recovery under the Note

19. Plaintiff incorporates by reference the preceding paragraphs.

20. Platinum defaulted under the terms of the Note, Mortgage and other Loan Documents as more specifically set forth above.

21. Plaintiff demanded all sums under the Loan and Loan Documents to be immediately due and payable.

22. By the filing of this action, Plaintiff further declares all sums due under the Loan and Loan Documents to be immediately due and payable.

23. The sums due on the Loan are as set forth above.

## COUNT II
### Foreclosure of Mortgage

24. Plaintiff incorporates by reference the preceding paragraphs.

25. Platinum committed a payment default by failing to pay the Loan in full upon its maturity on February 8, 2008.

26. O.R.C. §1309.604 authorizes the foreclosure of both personal property and real property "in accordance with the rights with respect to real property."

27. Defendant Key Equipment Finance Inc. has, claims to have, or may claim to have a junior interest in or junior lien upon some or all of the Property by virtue of its security interest.

28. Defendant LodgeNet Entertainment Corp. has, claims to have, or may claim to have a junior interest in or junior lien upon some or all of the Property by virtue of its security interest.

29. Defendant US Bancorp Business Equipment Finance Group has, claims to have, or may claim to have a junior interest in or junior lien upon some or all of the Property by virtue of its security interest.

30. Defendant Gaylor, Inc. has, claims to have, or may claim to have a junior interest in or junior lien upon some or all of the Property by virtue of its junior mechanics lien.

31. Defendant Champion Services, LLC has, claims to have, or may claim to have a junior interest in or junior lien upon some or all of the Property by virtue of its junior mechanics lien.

32. Defendant Galloway Landscape, LLC has, claims to have, or may claim to have a junior interest in or junior lien upon some or all of the Property by virtue of its junior mechanics lien.

33. Defendant Ohio State Bureau of Worker's Compensation has, claims to have, or may claim to have a junior interest in or junior lien upon some or all of the Property by virtue of its judgment lien and certificates of amount of premium due filed against Platinum as follows:

      a. Risk No. 1453902-0, Acct. No. 676648 filed September 28, 2007 in Franklin County Recorder's Instrument # 200709280170137 and rerecocrded in 200709280170161.

      b. Judgment lien #07 JG 0265667 against Platinum and Holiday Inn Eastin.

34. Defendant Greenscapes Landscape Company, Inc. has, claims to have, or may claim to have a junior interest in or junior lien upon some or all of the Property by virtue of its junior mechanics lien.

35. Defendant Schindler Elevator Corporation has, claims to have, or may claim to have a junior interest in or junior lien upon some or all of the Property by virtue of its mechanics lien.

36. Defendant All-Seal Coatings, Inc. has, claims to have, or may claim to have a junior interest in or junior lien upon some or all of the Property by virtue of its judgment lien.

37. Defendant ECU Staffing Multi-Services, Inc. has, claims to have, or may claim to have a junior interest in or junior lien upon some or all of the Property by virtue of its pending action against Platinum.

38. Defendant Columbus/Worthington Heating and Air Conditioning Company, Inc. has, claims to have, or may claim to have a junior interest in or junior lien upon some or all of the Property by virtue of its pending action against Platinum.

39. Defendant Crane Group Co. has, claims to have, or may claim to have a junior interest in or junior lien upon some or all of the Property by virtue of its judgment lien.

40. Defendant Franklin County Treasurer has, claims to have, or may claim to have an interest in or lien upon some or all of the Property by virtue of a lien for unpaid real estate taxes and assessments and personal property tax, if any.

41. Upon information and belief, Platinum has distributed rents and other revenue from the Property encumbered by the Mortgage after events of default under the Note, Mortgage and other Loan Documents, all to the Plaintiff's detriment.

42. Plaintiff has the right to the appointment of a receiver pursuant to the provisions of the Mortgage, quoted above and as provided by O.R.C. § 2735.01(B) & (F).

**COUNT III**
**Recovery under the Guaranty**

43. Plaintiff incorporates by reference the preceding paragraphs.

44. To induce Morgan Stanley to make the Loan, Defendants Studer, Graft, Malas and Coratola (collectively the "Guarantors") executed the Guaranty.

45. The Guaranty provides that the Guarantors "jointly and severally hereby absolutely and unconditionally guarantee to Lender the prompt and unconditional payment of (i) the Debt . . . and (ii) the Guaranteed Recourse Obligations of Borrower" as set forth in Section 11.22 of the Loan Agreement. *Id.* at ¶1.

46. Section 11.22 of the Loan Agreement provides that "[Defendant Platinum's] liability for the obligations (as defined (sic) the Mortgage) are the fully recourse, personal obligations of Borrower. Additionally, [Defendant Platinum] agrees to indemnify, defend and hold Lender harmless as a result of and to the extent of any loss, damage, cost, expense, liability, claim or other obligations incurred by Lender" due to the occurrence of any event listed in (i) – (xiv).

47. By reason of Platinum's failure to pay Plaintiff pursuant to the Note and the other breaches of the Loan Documents, as more particularly set forth above, the Guarantors became indebted to Plaintiff.

48. Plaintiff has been damaged in the amount set forth above as a result of the defaults of Platinum, plus all interest, costs and attorney fees.

## COUNT IV
### Foreclosure of Security Interest

49. Plaintiff incorporates by reference the preceding paragraphs.

50. To further secure repayment of the indebtedness evidenced by the Note, Platinum included in the Mortgage a security agreement granting a security interest in certain personal property (the "Personal Property"), which Personal Property was located both on and off the Property.

51. Plaintiff is the current holder of a perfected security interest in the Personal Property.

52. Plaintiff has a valid and subsisting interest in and lien upon the Personal Property as described in the Mortgage.

53. The Mortgage further provides that upon the breaking of conditions in the Mortgage, that the mortgagee is entitled to foreclose upon its security interest in the Personal Property.

54. O.R.C. §1309.604 authorizes the foreclosure of both personal property and real property "in accordance with the rights with respect to real property."

55. By reason of the events of default more particularly set forth above, Plaintiff is entitled to possession of the Personal Property, but Platinum has unlawfully detained possession of the Personal Property. Plaintiff is therefore entitled to have its security interest foreclosed, the Personal Property sold, and the proceeds applied in payment of the Plaintiff's claims.

<u>COUNT V</u>
<u>**Assignment of Rents and Appointment of Receiver**</u>

56. Plaintiff incorporates by reference the preceding paragraphs.

57. To further secure repayment of the indebtedness evidenced by the Note, Platinum executed the Assignment of Rents.

58. By virtue of the Assignment of Rents, Platinum "absolutely and unconditionally assign[ed] and grant[ed] to Lender the following property, rights, interests and estates, now owned, or hereafter acquired by [Platinum]" including, but not limited to, "all existing and future leases affecting the use, enjoyment, or occupancy of the [Property;] . . . [and] all rents, additional rents, early termination fees or payments or other termination fees or payments, revenues, income, issues and profits" from the Property.[1]

59. Pursuant to the terms of the Assignment of Rents, Platinum was granted a license to collect rents, which is automatically revoked upon an event of default. Upon an event of default, Plaintiff "shall immediately be entitled to possession of all Rents and sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the Property."[2]

60. Moreover, as more particularly set forth above, the Mortgage grants Plaintiff the right to have a receiver appointed by the Court for the collection of rents upon an occurrence of an event of default under the Loan Documents.[3]

**WHEREFORE**, Plaintiff respectfully demands judgment as follows:

A. For the Plaintiff and against Platinum Lodging, LLC on the Note for the amounts set forth above.

---

[1] Complaint, **Exhibit D**, §1.1(a)-(j).

[2] *See* Complaint, **Exhibit D**, §§2.1, 3.1.

[3] *See* Complaint **Exhibit C**, § 16.5.

B. That Plaintiff be found and declared to have a first lien upon the Property described in the Mortgage, subject only to liens for unpaid real estate taxes and assessments held by the Franklin County Treasurer, if any.

C. That all named Defendants and others claiming an interest in the Property be required to set up their interests in the Property or be forever barred from asserting any interest in the Property.

D. That the Mortgage be foreclosed.

E. That all of the property, real or personal, tangible or intangible, described in the Mortgage be ordered sold and that Plaintiff be paid out of such sale.

F. That the Court appoint a duly qualified and authorized receiver to take possession, manage and control of all real and personal property as set forth in the Mortgage and Assignment of Rents and that all rents, income, fees, receivables, receipts, revenues, deposits, accounts, cash, issues, profits, and other consideration paid to, for the account of or for the benefit of Platinum or arising from the Property, be paid over to Plaintiff, its representative or the receiver, and applied to any indebtedness in any manner and order Plaintiff deems appropriate.

G. That Platinum be enjoined from interfering with the Receiver in carrying out its duties.

H. That Platinum be ordered to account for all funds received since the Note went into default.

I. For the Plaintiff and against Defendants Matthew Studer, Fred Graft, Ernie Malas and Peter Coratola, jointly and severally, pursuant to their unlimited and unconditional Guaranty, for the amounts set forth above.

J.  That Plaintiff is entitled to receive all costs of collection of the mortgage debts, including but not limited to, interest, attorneys' fees and other costs from the proceeds of sale.

K.  For such other equitable relief as may be proper and necessary.

Respectfully submitted,

James L. Allen (0077534)
Paul E. Perry (0023326)
Miller, Canfield, Paddock and Stone, PLC
840 West Long Lake Road, Suite 200
Troy, Michigan 48098
(248) 879-2000
(248) 879-2001 Fax
allenj@millercanfield.com
perry@millercanfield.com
*Attorneys for Plaintiff*

Dated: April ___, 2008

INTERCREDITOR AGREEMENT

by and between

MORGAN STANLEY MORTGAGE CAPITAL INC., a New York corporation

as Senior Lender

and

MORGAN STANLEY MORTGAGE CAPITAL INC., a New York corporation

as Mezzanine Lender

Dated as of August 3, 2006

Premises: Holiday Inn Hotel & Suites
            4560 Hilton Corporate Drive
            Columbus, Ohio 43232

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "Agreement"), dated as of August 3, 2006 by and between MORGAN STANLEY MORTGAGE CAPITAL INC., a New York corporation having an address at 1221 Avenue of the Americas, New York, New York 10020 ("Senior Lender"), and MORGAN STANLEY MORTGAGE CAPITAL INC., a New York corporation having an address at 1221 Avenue of the Americas, New York, New York 10020 ("Mezzanine Lender").

## RECITALS

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Loan Agreement, dated as of July 18, 2006, between PLATINUM LODGING, LLC, an Ohio limited liability company ("Borrower") and Senior Lender (the "Senior Loan Agreement"), Senior Lender has made or is about to make a loan to Borrower in the original principal amount of $28,500,000.00 (the "Senior Loan"), which Senior Loan is evidenced by a certain Promissory Note, dated as of July 18, 2006, made by Borrower to Senior Lender in the amount of the Senior Loan (the "Senior Note"), and secured by, among other things, a Mortgage and Security Agreement, dated as of July 18, 2006, made by Borrower in favor of Senior Lender (the "Senior Mortgage"), which Senior Mortgage encumbers the real property described on Exhibit A attached hereto and made a part hereof, and all improvements thereon and appurtenances thereto (collectively, the "Premises"); and

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Mezzanine Loan Agreement, dated as of August 3, 2006, between PLATINUM LODGING MEZZ, LLC, an Ohio limited liability company ("Mezzanine Borrower") and Mezzanine Lender (the "Mezzanine Loan Agreement"), Mezzanine Lender is the owner and holder of a loan to Mezzanine Borrower in the original principal amount of $10,500,000.00 (the "Mezzanine Loan"), which Mezzanine Loan is evidenced by a certain Promissory Note, dated as of August 3, 2006, made by Mezzanine Borrower in favor of Mezzanine Lender in the amount of the Mezzanine Loan (the "Mezzanine Note"), and secured by, among other things, a Pledge and Security Agreement, dated as of August 3, 2006, from Mezzanine Borrower pursuant to which Mezzanine Lender is granted a first priority security interest in all of Mezzanine Borrower's ownership interests in Borrower and its managing member (the "Pledge Agreement"); and

WHEREAS, as of the date hereof and in connection with the funding of the Mezzanine Loan, Borrower has made a principal prepayment on the Senior Loan in the amount of $4,000,000.00, thereby reducing the principal balance of the Senior Loan to $24,500,000.00; and

WHEREAS, Senior Lender and Mezzanine Lender desire to enter into this Agreement to provide for the relative priority of the Senior Loan Documents (as such term is hereinafter defined) and the Mezzanine Loan Documents (as such term is hereinafter defined) on the terms and conditions herein below set forth, and to evidence certain agreements with respect to the relationship between the Mezzanine Loan and the Mezzanine Loan Documents, on the one hand, and the Senior Loan and the Senior Loan Documents, on the other hand.

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Senior Lender and Mezzanine Lender hereby agree as follows:

Section 1.    <u>Certain Definitions; Rules of Construction</u>.

(a)    As used in this Agreement, the following capitalized terms shall have the following meanings:

"<u>Affiliate</u>" means, as to any particular Person, any Person directly or indirectly, through one or more intermediaries, controlling, Controlled by or under common control with the Person or Persons in question.

"<u>Agreement</u>" means this Agreement, as the same may be amended, modified and in effect from time to time, pursuant to the terms hereof.

"<u>Award</u>" has the meaning provided in <u>Section 9(d)</u> hereof.

"<u>Borrower</u>" has the meaning provided in the <u>Recitals</u> hereto.

"<u>Borrower Group</u>" has the meaning provided in <u>Section 10(c)</u> hereof.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or a legal holiday on which national banks are not open for general business in (i) the State of New York, (ii) the state where the corporate trust office of the Trustee is located, or (iii) the state where the servicing offices of the Servicer are located.

"<u>CDO</u>" has the meaning provided in the definition of the term "Qualified Transferee."

"<u>CDO Asset Manager</u>" with respect to any Securitization Vehicle which is a CDO, shall mean the entity which is responsible for managing or administering the Mezzanine Loan as an underlying asset of such Securitization Vehicle or, if applicable, as an asset of any Intervening Trust Vehicle (including, without limitation, the right to exercise any consent and control rights available to the holder of the Mezzanine Loan).

"<u>Certificates</u>" means any securities (including all classes thereof) representing beneficial ownership interests in the Senior Loan or in a pool of mortgage loans including the Senior Loan issued in connection with a Securitization of the Senior Loan.

"<u>Continuing Senior Loan Event of Default</u>" means an Event of Default under the Senior Loan for which (i) Senior Lender has provided notice of such Event of Default to Mezzanine Lender in accordance with <u>Section 11(a)</u> of this Agreement and (ii) the cure period provided to Mezzanine Lender in <u>Section 11(a)</u> of this Agreement has expired.

"<u>Control</u>" means the ownership, directly or indirectly, in the aggregate of more than fifty percent (50%) of the beneficial ownership interests of an entity and the possession,

directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise. "Controlled by," "controlling" and "under common control with" shall have the respective correlative meaning thereto.

"Directing Mezzanine Lender" has the meaning provided in Section 4(c) hereof.

"Eligibility Requirements" means, with respect to any Person, that such Person (i) has total assets (in name or under management) in excess of $600,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $250,000,000 and (ii) is regularly engaged in the business of making or owning commercial real estate loans or operating commercial mortgage properties.

"Enforcement Action" means any (i) judicial or non-judicial foreclosure proceeding, the exercise of any power of sale, the taking of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of any other enforcement action against the Premises or Borrower, including, without limitation, the taking of possession or control of the Premises, (ii) acceleration of, or demand or action taken in order to collect, all or any indebtedness secured by the Premises (other than giving of notices of default and statements of overdue amounts) or (iii) exercise of any right or remedy available to Senior Lender under the Senior Loan Documents, at law, in equity or otherwise with respect to Borrower and/or the Premises.

"Equity Collateral" means the equity interests of Borrower and its managing member pledged pursuant to the Pledge Agreement.

"Equity Collateral Enforcement Action" means any action or proceeding or other exercise of Mezzanine Lender's rights and remedies commenced by Mezzanine Lender, in law or in equity, or otherwise, in order to realize upon the Equity Collateral.

"Event of Default" as used herein means (i) with respect to the Senior Loan and the Senior Loan Documents, any Event of Default thereunder which has occurred, is continuing (i.e., has not been cured by Borrower or by the Mezzanine Lender in accordance with the terms of this Agreement) and (ii) with respect to the Mezzanine Loan and the Mezzanine Loan Documents, any Event of Default thereunder which has occurred and is continuing (i.e., has not been cured by Mezzanine Borrower).

"Intervening Trust Vehicle" with respect to any Securitization Vehicle which is a CDO, shall mean a trust vehicle or entity which holds the Mezzanine Loan as collateral securing (in whole or in part) any obligation or security held by such Securitization Vehicle as collateral for the CDO.

"Loan Pledgee" has the meaning provided in Section 15 hereof.

"Loan Purchase Price" has the meaning provided in Section 13(a) hereof.

"Mezzanine Borrower" has the meaning provided in the Recitals hereto.

"Mezzanine Lender" has the meaning provided in the first paragraph of this Agreement.

"Mezzanine Loan" has the meaning provided in the Recitals hereto.

"Mezzanine Loan Agreement" has the meaning provided in the Recitals hereto.

"Mezzanine Loan Cash Management Agreement" means any cash management agreement executed in connection with, or the cash management provisions of, the Mezzanine Loan Documents.

"Mezzanine Loan Documents" means the Mezzanine Loan Agreement, the Mezzanine Note and the Pledge Agreement, together with all documents and instruments set forth on Exhibit C hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"Mezzanine Loan Modification" has the meaning provided in Section 7(b) hereof.

"Mezzanine Note" has the meaning provided in the Recitals hereto.

"Monetary Cure Period" has the meaning provided in Section 11(a) hereof.

"Permitted Fund Manager" means any Person that on the date of determination is (i) an entity that is a Qualified Transferee under clauses (ii)(A), (B), (C) or (D) of the definition thereof or any other nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate, (ii) investing through a fund with committed capital of at least $250,000,000 and (iii) not subject to a Proceeding.

"Person" means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof) endowment fund or any other form of entity.

"Pledge" has the meaning provided in Section 15 hereof.

"Pledge Agreement" has the meaning provided in the Recitals hereto.

"Premises" has the meaning provided in the Recitals hereto.

"Proceeding" has the meaning provided in Section 10(c) hereof.

"Property Manager" means FOCUS LODGING GROUP, LLC, an Ohio limited liability company, or any successor thereto as property manager of the Premises.

"Protective Advances" means all sums advanced for the purpose of payment of real estate taxes (including special payments in lieu of real estate taxes), maintenance costs,

insurance premiums or other items (including capital items) reasonably necessary to protect the Premises or the Separate Collateral, respectively, from forfeiture, casualty, loss or waste, including, with respect to the Mezzanine Loan, amounts advanced by Mezzanine Lender pursuant to Section 11 hereof.

"Purchase Option Notice" has the meaning provided in Section 13(a) hereof.

"Qualified Manager" shall mean a property manager of the Premises which (i) is a reputable management company having at least five (5) years' experience in the management of hospitality properties with similar uses as the Premises and in the jurisdiction in which the Premises are located, (ii) has, for at least five (5) years prior to its engagement as property manager, managed at least 10,000 full service or extended stay hotel rooms and (iii) is not the subject of a bankruptcy or similar insolvency proceeding.

"Qualified Transferee" means (i) Mezzanine Lender, (ii) True North Mezzanine Investment Fund, LLC, (iii) Winston Hotels, (iv) Ashford Hospitality Trust REIT or (v) one or more of the following:

  (A) a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (A) satisfies the Eligibility Requirements;

  (B) an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (B) satisfies the Eligibility Requirements;

  (C) an institution substantially similar to any of the foregoing entities described in clauses (v)(A) or (v)(B) that satisfies the Eligibility Requirements;

  (D) any entity Controlled by any of the entities described in clause (i), clause (ii), clause (iii), clause (iv) or clauses (v)(A) or (v)(C) above;

  (E) a Qualified Trustee (or in the case of a CDO, a single purpose bankruptcy-remote entity which contemporaneously pledges its interest in the Mezzanine Loan to a Qualified Trustee) in connection with (A) a securitization of, (B) the creation of collateralized debt obligations ("CDO") secured by, or (C) a financing through an "owner trust" of, a Mezzanine Loan (any of the foregoing, a "Securitization Vehicle", provided that (1) one or more classes of securities issued by such Securitization Vehicle is initially rated at least investment grade by each of the Rating Agencies which assigned a rating to one or more classes of securities issued in connection with a Securitization (it being understood that with respect to any Rating Agency that assigned such a rating to the securities issued by such Securitization Vehicle, a Rating Agency Confirmation will not be required in connection with a transfer of a Mezzanine Loan to such Securitization Vehicle); (2) in the case of a Securitization Vehicle that is not a CDO, the special servicer

of such Securitization Vehicle has a Required Special Servicer Rating (such entity, an "Approved Servicer") and such Approved Servicer is required to service and administer such Mezzanine Loan in accordance with servicing arrangements for the assets held by the Securitization Vehicle which require that such Approved Servicer act in accordance with a servicing standard notwithstanding any contrary direction or instruction from any other Person; or (3) in the case of a Securitization Vehicle that is a CDO, the CDO Asset Manager and, if applicable, each Intervening Trust Vehicle that is not administered and managed by a Qualified Trustee, or a CDO Asset Manager which is a Qualified Transferee, are each a Qualified Transferee under clause (i), clause (ii), clause (iii), clause (iv) or clauses (v)(A), (v)(B), (v)(C) or (v)(D) of this definition; or

(F)    an investment fund, limited liability company, limited partnership or general partnership where a Permitted Fund Manager acts as the general partner, managing member or fund manager and at least 50% of the equity interests in such investment vehicle are owned, directly or indirectly, by one or more entities that are otherwise Qualified Transferees under clauses (v)(A), (B), (C) or (D) of this definition.

"Qualified Trustee" means (i) a corporation, national bank, national banking association or a trust company, organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers and to accept the trust conferred, having a combined capital and surplus of at least $100,000,000 and subject to supervision or examination by federal or state authority, (ii) an institution insured by the Federal Deposit Insurance Corporation or (iii) an institution whose long-term senior unsecured debt is rated either of the then in effect top two rating categories of each of the Rating Agencies.

"Rating Agencies" shall mean, prior to a Securitization, each of S&P, Moody's Investors Service, Inc., and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been designated by Senior Lender and, after a Securitization, shall mean any of the foregoing that have rated any of the Certificates.

"Rating Agency Confirmation" means each of the Rating Agencies shall have confirmed in writing that the occurrence of the event with respect to which such Rating Agency Confirmation is sought shall not result in a downgrade, qualification or withdrawal of the applicable rating or ratings ascribed by such Rating Agency to any of the Certificates then outstanding. In the event that no Certificates are outstanding or the Senior Loan is not part of a Securitization, any action that would otherwise require a Rating Agency Confirmation shall require the consent of the Senior Lender, which consent shall not be unreasonably withheld or delayed.

"Redirection Notice" has the meaning provided in Section 15 hereof.

"Required Special Servicer Rating" means (i) a rating of "CSS1" in the case of Fitch, (ii) on the S&P Select Servicer List as a U.S. Commercial Mortgage Special Servicer in the case of S&P and (iii) in the case of Moody's, such special servicer is acting as special servicer in a commercial mortgage loan securitization that was rated by Moody's within the twelve (12) month period prior to the date of determination, and Moody's has not downgraded or

withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities.

"S&P" means Standard & Poors Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Securitization" means the sale or securitization of the Senior Loan (or any portion thereof) in one or more transactions through the issuance of securities, which securities may be assigned ratings by the Rating Agencies.

"Senior Lender" has the meaning provided in the first paragraph of this Agreement.

"Senior Loan" has the meaning provided in the Recitals hereto.

"Senior Loan Agreement" has the meaning provided in the Recitals hereto.

"Senior Loan Cash Management Agreement" means any cash management agreement or agreements executed in connection with, or cash management provisions of, the Senior Loan Documents.

"Senior Loan Default Notice" has the meaning provided in Section 11(a) hereof.

"Senior Loan Documents" means the Senior Loan Agreement, the Senior Note and the Senior Mortgage, together with the instruments and documents set forth on Exhibit B hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"Senior Loan Liabilities" shall mean, collectively, all of the indebtedness, liabilities and obligations of Borrower evidenced by the Senior Loan Documents and all amounts due or to become due pursuant to the Senior Loan Documents, including interest thereon and any other amounts payable in respect thereof or in connection therewith, including, without limitation, any late charges, default interest, prepayment fees or premiums, exit fees, advances and post-petition interest.

"Senior Loan Modification" has the meaning provided in Section 7(a) hereof.

"Senior Mortgage" has the meaning provided in the Recitals hereto.

"Senior Note" has the meaning provided in the Recitals hereto.

"Separate Collateral" means (i) the Equity Collateral, (ii) the accounts (and monies therein from time to time) established pursuant to the Mezzanine Cash Management Agreement, and (iii) any other collateral given as security for the Mezzanine Loan pursuant to the Mezzanine Loan Documents, in each case not directly constituting security for the Senior Loan.

"SPE Constituent Entity" means Water Park Management Company, Inc., an Ohio corporation.

"Third Party Agreement" has the meaning provided in Section 5(a) hereof.

"Third Party Obligor" has the meaning provided in Section 5(a) hereof.

"Transfer" means any assignment, pledge, conveyance, sale, transfer, mortgage, encumbrance, grant of a security interest, issuance of a participation interest, or other disposition, either directly or indirectly, by operation of law or otherwise.

(b)    For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)    all capitalized terms defined in the recitals to this Agreement shall have the meanings ascribed thereto whenever used in this Agreement and the terms defined in this Agreement have the meanings assigned to them in this Agreement, and the use of any gender herein shall be deemed to include the other genders;

(ii)    terms not otherwise defined herein shall have the meaning assigned to them in the Senior Loan Agreement;

(iii)    all references in this Agreement to designated Sections, Subsections, Paragraphs, Articles, Exhibits, Schedules and other subdivisions or addenda without reference to a document are to the designated sections, subsections, paragraphs and articles and all other divisions of and exhibits, schedules and all other addenda to this Agreement, unless otherwise specified;

(iv)    a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall apply to Paragraphs and other subdivisions;

(v)    the terms "includes" or "including" shall mean without limitation by reason of enumeration;

(vi)    the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(vii)    the words "to Mezzanine Lender's knowledge" or "to the knowledge of Mezzanine Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of Mezzanine Lender with direct oversight responsibility for the Mezzanine Loan without independent investigation or inquiry and without any imputation whatsoever; and

(viii)    the words "to Senior Lender's knowledge" or "to the knowledge of Senior Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of Senior Lender with direct oversight responsibility for the Senior Loan without independent investigation or inquiry and without any imputation whatsoever.

Section 2.    <u>Approval of Loans and Loan Documents</u>.

(a)    Mezzanine Lender hereby acknowledges that (i) it has received and reviewed and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Senior Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Senior Loan Documents, (ii) the execution, delivery and performance of the Senior Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Mezzanine Loan Documents, (iii) Senior Lender is under no obligation or duty to, nor has Senior Lender represented that it will, see to the application of the proceeds of the Senior Loan by Borrower or any other Person to whom Senior Lender disburses such proceeds, and (iv) any application or use of the proceeds of the Senior Loan for purposes other than those provided in the Senior Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Senior Loan Documents.

(b)    Senior Lender hereby acknowledges that (i) it has received and reviewed, and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Mezzanine Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Mezzanine Loan Documents, (ii) the execution, delivery and performance of the Mezzanine Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Senior Loan Documents, (iii) Mezzanine Lender is under no obligation or duty to, nor has Mezzanine Lender represented that it will, see to the application of the proceeds of the Mezzanine Loan by Mezzanine Borrower or any other Person to whom Mezzanine Lender disburses such proceeds and (iv) any application or use of the proceeds of the Mezzanine Loan for purposes other than those provided in the Mezzanine Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Mezzanine Loan Documents. Senior Lender hereby acknowledges and agrees that any conditions precedent to Senior Lender's consent to mezzanine financing as set forth in the Senior Loan Documents or any other agreements with the Borrower, as they apply to the Mezzanine Loan Documents or the making of the Mezzanine Loan, have been either satisfied or waived.

Section 3.    <u>Representations and Warranties</u>.

(a)    Mezzanine Lender hereby represents and warrants as follows:

(i)    <u>Exhibit C</u> attached hereto and made a part hereof is a true, correct and complete listing of all of the Mezzanine Loan Documents as of the date hereof. To Mezzanine Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Mezzanine Loan Documents.

(ii)    Mezzanine Lender is the legal and beneficial owner of the entire Mezzanine Loan free and clear of any lien, security interest, option or other charge or encumbrance, other than any lien or security interest granted to any Loan Pledgee (as hereinafter defined) as contemplated by the provisions of <u>Section 15</u> hereof.

(iii)    There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

(iv)    Mezzanine Lender has, independently and without reliance upon Senior Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(v)    Mezzanine Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Mezzanine Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)    Mezzanine Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Mezzanine Lender enforceable against Mezzanine Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws, and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

(viii)    To Mezzanine Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Mezzanine Lender of this Agreement or consummation by Mezzanine Lender of the transactions contemplated by this Agreement.

(ix)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of Mezzanine Lender, (w) to Mezzanine Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Mezzanine Lender is a party or to which any of its properties are subject, (x) to Mezzanine Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Mezzanine Lender pursuant to the terms of any such contract, mortgage, lease, bond, indenture, agreement, franchise, or other instrument (provided, however, that Mezzanine Lender shall have the right to grant a lien, charge, encumbrance, claim or security interest in the Mezzanine Loan or any portion thereof to a Loan Pledgee as contemplated by the provisions of Section 15 hereof), (y) violate any judgment, order, injunction, decree, or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Mezzanine

Lender has knowledge against, or binding upon, Mezzanine Lender or upon any of the securities, properties, assets, or business of Mezzanine Lender or (z) to Mezzanine Lender's knowledge, constitute a violation by Mezzanine Lender of any statute, law or regulation that is applicable to Mezzanine Lender.

(x)    The Mezzanine Loan is not cross-defaulted with any loan other than the Senior Loan.  The Premises do not secure any loan from Mezzanine Lender to Mezzanine Borrower or any other Affiliate of Borrower.

(b)    Senior Lender hereby represents and warrants as follows:

(i)    Exhibit B attached hereto and made a part hereof is a true, correct and complete listing of the Senior Loan Documents as of the date hereof.  To Senior Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Senior Loan Documents.

(ii)    Senior Lender is the legal and beneficial owner of the Senior Loan free and clear of any lien, security interest, option or other charge or encumbrance.

(iii)    There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

(iv)    Senior Lender has, independently and without reliance upon Mezzanine Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(v)    Senior Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Senior Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)    Senior Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Senior Lender enforceable against Senior Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

(viii)    To Senior Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Senior Lender of this Agreement or consummation by Senior Lender of the transactions contemplated by this Agreement.

(ix)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of Senior Lender, (w) to Senior Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Senior Lender is a party to or to which any of its properties are subject, (x) to Senior Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Senior Lender pursuant to the terms of any such contract, mortgage, lease, bond, indenture, agreement, franchise or other instrument, (y) violate any judgment, order, injunction, decree or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Senior Lender has knowledge against, or binding upon, Senior Lender or upon any of the securities, properties, assets, or business of Senior Lender or (z) to Senior Lender's knowledge, constitute a violation by Senior Lender of any statute, law or regulation that is applicable to Senior Lender.

(x)    The Senior Loan is not cross-defaulted with any other loan. The Premises do not secure any other loan from Senior Lender to Borrower, Mezzanine Borrower or any other Affiliate of Borrower.

Section 4.    <u>Transfer of Mezzanine Loan or Senior Loan</u>.

(a)    Mezzanine Lender shall not Transfer more than 49% of its beneficial interest in the Mezzanine Loan unless either (i) a Rating Agency Confirmation has been given with respect to such Transfer, in which case the related transferee shall thereafter be deemed to be a "Qualified Transferee" for all purposes of this Agreement, or (ii) such Transfer is to a Qualified Transferee. Any such transferee must assume in writing the obligations of Mezzanine Lender hereunder and agree to be bound by the terms and provisions hereof. Such proposed transferee shall also remake each of the representations and warranties contained herein for the benefit of the Senior Lender.

(b)    At least five (5) days prior to a transfer to a Qualified Transferee, the Mezzanine Lender shall provide to Senior Lender and, if any Certificates are outstanding, to the Rating Agencies, a certification that such transfer will be made in accordance with this <u>Section 4</u>, such certification to include the name and contact information of the Qualified Transferee.

(c)    If more than one Person shall hold a direct interest in the Mezzanine Loan, the holder(s) of more than 50% of the principal amount of the Mezzanine Loan shall designate by written notice to Senior Lender one of such Persons (the "<u>Directing Mezzanine Lender</u>") to act on behalf of all such Persons holding an interest in the Mezzanine Loan. The Directing Mezzanine Lender shall have the sole right to receive any notices which are required to be given or which may be given to Mezzanine Lender pursuant to this Agreement and to exercise the rights and power given to Mezzanine Lender hereunder, including any approval rights of Mezzanine Lender; provided, that until the Directing Mezzanine Lender has been so designated,

the last Person known to the Senior Lender to hold more than a 50% direct interest in the Mezzanine Loan shall be deemed to be the Directing Mezzanine Lender. Once the Directing Mezzanine Lender has been designated hereunder, Senior Lender shall be entitled to rely on such designation until it has received written notice from the holder(s) of more than 50% of the principal amount of the Mezzanine Loan of the designation of a different Person to act as the Directing Mezzanine Lender.

(d)    Mezzanine Lender acknowledges that any Rating Agency Confirmation may be granted or denied by the Rating Agencies in their sole and absolute discretion and that such Rating Agencies may charge customary fees in connection with any such action.

(e)    Senior Lender may, from time to time, in its sole discretion Transfer all or any of the Senior Loan or any interest therein, and notwithstanding any such Transfer or subsequent Transfer, the Senior Loan and the Senior Loan Documents shall be and remain a senior obligation in the respects set forth in this Agreement to the Mezzanine Loan and the Mezzanine Loan Documents in accordance with the terms and provisions of this Agreement.

Section 5.    Foreclosure of Separate Collateral.

(a)    Mezzanine Lender shall not exercise any rights it may have under the Pledge Agreement and the other Mezzanine Loan Documents or applicable law with respect to a foreclosure or other realization upon the Equity Collateral (including, without limitation, obtaining title to the Equity Collateral or selling or otherwise transferring the Equity Collateral) without a Rating Agency Confirmation unless (i) the transferee of title to the Equity Collateral is a Qualified Transferee, (ii) the Premises will be managed by a Qualified Manager promptly after the transfer of title to the Equity Collateral, and (iii) if not in place prior to the transfer of title to the Equity Collateral, hard cash management and adequate reserves for taxes, insurance, debt service, ground rents, capital repair and improvement expenses, tenant improvement expenses and leasing commissions and operating expenses will be implemented under the Senior Loan promptly after the transfer of title to the Equity Collateral; provided, that the implementation of such hard cash management and reserves would not cause a "significant modification" of the Senior Loan, as such term is defined in Treasury Regulations Section 1.860G-2(b). Additionally, if a non-consolidation opinion was delivered in connection with the closing of the Senior Loan, the transferee of the Equity Collateral shall deliver a new non-consolidation opinion relating to the transferee acceptable to the Rating Agencies within ten (10) business days of the transfer of title to the Equity Collateral. The Mezzanine Lender shall provide notice of the transfer and an officer's certificate from an officer of Mezzanine Lender certifying that all conditions set forth in this Section 5(a) have been satisfied to Senior Lender and the Rating Agencies upon consummation of any transfer of the Equity Collateral pursuant to this Section 5(a). Senior Lender may request reasonable evidence that the foregoing requirements have been satisfied. In the event that such Transfer results in the removal of any guarantor, indemnitor, pledgor, or other obligor under the Senior Loan Documents (each, a "Third Party Obligor"), such transferee or an Affiliate thereof reasonably satisfactory to the Senior Lender shall: (A) execute and deliver to Senior Lender a guaranty, indemnity, pledge agreement or other agreement which provides for the obligations of such obligor (each, a "Third Party Agreement"), in each case, in a form substantially similar to the Third Party Agreement that it is replacing, pursuant to which the Third Party Obligor shall undertake the obligations set forth therein, and (B) if there are

Certificates then outstanding, deliver (or cause to be delivered) to Senior Lender and each Rating Agency, an opinion of counsel that the substitution of the original Third Party Obligor and the original Third Party Agreement with a substitute Third Party Obligor and a substitute Third Party Agreement, would not cause a "significant modification" of the Senior Loan, as such term is defined in Treasury Regulations Section 1.860G-2(b).

(b)     Nothing contained herein shall limit or restrict the right of Mezzanine Lender to exercise its rights and remedies, in law or in equity, or otherwise, in order to realize on any Separate Collateral that is not Equity Collateral.

(c)     In the event Mezzanine Lender or any purchaser at a UCC sale obtains title to the Separate Collateral, Senior Lender hereby acknowledges and agrees that any transfer or assumption fee in the Senior Loan Agreement shall be waived as a condition to such transfer and any such transfer shall not constitute a breach or default under the Senior Loan Documents, provided the conditions in Section 5(a) are met. Senior Lender also acknowledges and agrees that it will not impose any unreasonable fees or delays in connection with such Transfer.

Section 6.     Notice of Rating Confirmation. Mezzanine Lender promptly shall notify Senior Lender of any intended action relating to the Mezzanine Loan which would require Rating Agency Confirmation pursuant to this Agreement and shall cooperate with Senior Lender in obtaining such confirmation. Senior Lender promptly shall notify Mezzanine Lender of any intended action relating to the Senior Loan which would require Rating Agency Confirmation pursuant to this Agreement and shall cooperate with Mezzanine Lender in obtaining such confirmation. Mezzanine Lender shall pay all fees and expenses of the Rating Agencies in connection with any request for any Rating Agency Confirmation pursuant to this Agreement.

Section 7.     Modifications, Amendments, Etc.

(a)     Senior Lender shall have the right without the consent of Mezzanine Lender in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "Senior Loan Modification") of the Senior Loan or the Senior Loan Documents provided that no such Senior Loan Modification shall (i) increase the interest rate or principal amount of the Senior Loan, (ii) increase in any other material respect any monetary obligations of Borrower under the Senior Loan Documents, (iii) extend or shorten the scheduled maturity date of the Senior Loan (except that Senior Lender may permit Borrower to exercise any extension options in accordance with the terms and provisions of the Senior Loan Documents), (iv) convert or exchange the Senior Loan into or for any other indebtedness or subordinate any of the Senior Loan to any indebtedness of Borrower, (v) amend or modify the provisions limiting transfers of interests in the Borrower or the Premises, (vi) modify or amend the terms and provisions of the Senior Loan Cash Management Agreement with respect to the manner, timing and method of the application of payments under the Senior Loan Documents, (vii) cross default the Senior Loan with any other indebtedness, (viii) consent to a higher strike price with respect to any new or extended interest rate cap agreement entered into in connection with the extended term of the Senior Loan, (ix) obtain any contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises, (or other similar equity participation), or (x) extend the period during which voluntary prepayments are prohibited or during which

prepayments require the payment of a prepayment fee or premium or yield maintenance charge or increase the amount of any such prepayment fee, premium or yield maintenance charge; provided, however, in no event shall Senior Lender be obligated to obtain Mezzanine Lender's consent to a Senior Loan Modification in the case of a work-out or other surrender, compromise, release, renewal, or indulgence relating to the Senior Loan during the existence of a Continuing Senior Loan Event of Default, except that under no conditions shall clause (i) (with respect to increase principal amount only), or clause (x) be modified without the written consent of Mezzanine Lender. In addition and notwithstanding the foregoing provisions of this Section 7, any amounts funded by the Senior Lender under the Senior Loan Documents as a result of (A) the making of any Protective Advances or other advances by the Senior Lender, or (B) interest accruals or accretions and any compounding thereof (including default interest), shall not be deemed to contravene this Section 7(a).

(b)    Mezzanine Lender shall have the right without the consent of Senior Lender in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "Mezzanine Loan Modification") of the Mezzanine Loan or the Mezzanine Loan Documents provided that no such Mezzanine Loan Modification shall (i) increase the interest rate or principal amount of the Mezzanine Loan, (ii) increase in any other material respect any monetary obligations of Mezzanine Borrower under the Mezzanine Loan Documents, (iii) extend or shorten the scheduled maturity date of the Mezzanine Loan (except that Mezzanine Lender may permit Mezzanine Borrower to exercise any extension options in accordance with the terms and provisions of the Mezzanine Loan Documents), (iv) convert or exchange the Mezzanine Loan into or for any other indebtedness or subordinate any of the Mezzanine Loan to any indebtedness of Mezzanine Borrower, (v) provide for any additional contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises or (vi) cross default the Mezzanine Loan with any other indebtedness. Notwithstanding anything to the contrary contained herein, if an Event of Default exists under the Mezzanine Loan Documents, Mezzanine Lender shall be permitted to modify or amend the Mezzanine Loan Documents in connection with a work-out or other surrender, compromise, release, renewal or modification of the Mezzanine Loan except that under no conditions shall clause (i), with respect to increases in principal amounts only, clause (ii), clause (iii) (with respect to shortening the maturity only), clause (iv) or clause (v) be modified without the written consent of the Senior Lender. In addition and notwithstanding the foregoing provisions of this Section 7(b), any amounts funded by the Mezzanine Lender under the Mezzanine Loan Documents as a result of (A) the making of any Protective Advances or other advances by the Mezzanine Lender, or (B) interest accruals or accretions and any compounding thereof (including default interest), shall not be deemed to contravene this Section 7(b).

(c)    Senior Lender shall deliver to Mezzanine Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Senior Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by Senior Lender) within a reasonable time after any of such applicable instruments have been executed by Senior Lender.

(d)    Mezzanine Lender shall deliver to Senior Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Mezzanine Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by Mezzanine Lender) within a reasonable time after any of such applicable instruments have been executed by Mezzanine Lender.

Section 8.    Subordination of Mezzanine Loan and Mezzanine Loan Documents.

(a)    Mezzanine Lender hereby subordinates and makes junior the Mezzanine Loan, the Mezzanine Loan Documents and the liens and security interests created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Senior Loan, (ii) the liens and security interests created by the Senior Loan Documents and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Senior Loan Documents, and no amendments or modifications to the Senior Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this Section 8(a).  Mezzanine Lender hereby acknowledges and agrees that the Mezzanine Loan is not secured by a lien on the Premises or any of the other collateral securing the Senior Loan or any other assets of the Borrower.

(b)    Every document and instrument included within the Mezzanine Loan Documents shall be subject and subordinate to each and every document and instrument included within the Senior Loan Documents and all extensions, modifications, consolidations, supplements, amendments, replacements and restatements of and/or to the Senior Loan Documents.

(c)    This Agreement shall not be construed as subordinating and shall not subordinate or impair Mezzanine Lender's first lien priority right, estate and interest in and to the Separate Collateral and Senior Lender hereby acknowledges and agrees that Senior Lender does not have and shall not hereafter acquire, any lien on, or any other interest whatsoever in, the Separate Collateral, or any part thereof, and that the exercise of remedies and realization upon the Separate Collateral by Mezzanine Lender or a Loan Pledgee in accordance with the terms and provisions of this Agreement shall not in and of itself constitute a default or an Event of Default under the Senior Loan Documents.

Section 9.    Payment Subordination.

(a)    Except (i) as otherwise expressly provided in this Agreement and (ii) in connection with the exercise by Mezzanine Lender of its rights and remedies with respect to the Separate Collateral in accordance with the terms of this Agreement, all of Mezzanine Lender's rights to payment of the Mezzanine Loan and the obligations evidenced by the Mezzanine Loan Documents are hereby subordinated to all of Senior Lender's rights to payment by Borrower of the Senior Loan and the obligations secured by the Senior Loan Documents, and Mezzanine Lender shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from Borrower and/or from the Premises prior to the date that all obligations of Borrower to Senior Lender under the Senior Loan Documents are paid.  If a Proceeding shall have occurred or a Continuing Senior Loan Event of Default shall have occurred and be continuing, Senior

Lender shall be entitled to receive payment and performance in full of all amounts due or to become due to Senior Lender before Mezzanine Lender is entitled to receive any payment on account of the Mezzanine Loan. All payments or distributions upon or with respect to the Mezzanine Loan which are received by Mezzanine Lender contrary to the provisions of this Agreement shall be received and held in trust by the Mezzanine Lender for the benefit of Senior Lender and shall be paid over to Senior Lender in the same form as so received (with any necessary endorsement) to be applied (in the case of cash) to, or held as collateral (in the case of non-cash property or securities) for, the payment or performance of the Senior Loan in accordance with the terms of the Senior Loan Documents. Nothing contained herein shall prohibit the Mezzanine Lender from making Protective Advances (and adding the amount thereof to the principal balance of the Mezzanine Loan) notwithstanding the existence of a default under the Senior Loan at such time.

(b)     Notwithstanding anything to the contrary contained in this Agreement, including, without limitation, Section 9(a), provided that no Event of Default shall then exist under the Senior Loan Documents, Mezzanine Lender may accept payments of any amounts due and payable from time to time which Mezzanine Borrower is obligated to pay Mezzanine Lender in accordance with the terms and conditions of the Mezzanine Loan Documents and Mezzanine Lender shall have no obligation to pay over to Senior Lender any such amounts.

(c)     Mezzanine Lender may take any Equity Collateral Enforcement Action which is permitted under Section 5 hereof; provided, however, that (i) Mezzanine Lender shall, prior to commencing any Equity Collateral Enforcement Action, give the Senior Lender written notice of the default which would permit Mezzanine Lender to commence such Equity Collateral Enforcement Action and (ii) Mezzanine Lender shall provide Senior Lender with copies of any and all material notices, pleadings, agreements, motions and briefs served upon, delivered to or with any party to any Equity Collateral Enforcement Action and otherwise keep Senior Lender reasonably apprised as to the status of any Equity Collateral Enforcement Action.

(d)     In the event of a casualty to the buildings or improvements constructed on any portion of the Premises or a condemnation or taking under a power of eminent domain of all or any portion of the Premises, Senior Lender shall have a first and prior interest in and to any payments, awards, proceeds, distributions, or consideration arising from any such event (the "Award"). If the amount of the Award is in excess of all amounts owed to Senior Lender under the Senior Loan Documents, however, and either the Senior Loan has been paid in full or Borrower is entitled to a remittance of same under the Senior Loan Documents other than to restore the Premises, such excess Award or portion to be so remitted to Borrower shall, to the extent permitted in the Senior Loan Documents, be paid to or at the direction of Mezzanine Lender, unless other Persons have claimed the right to such awards or proceeds, in which case Senior Lender shall only be required to provide notice to Mezzanine Lender of such excess Award and of any other claims thereto. In the event of any competing claims for any such excess Award, Senior Lender shall continue to hold such excess Award until Senior Lender receives an agreement signed by all Persons making a claim to the excess Award or a final order of a court of competent jurisdiction directing Senior Lender as to how and to which Person(s) the excess Award is to be distributed. Notwithstanding the foregoing, in the event of a casualty or condemnation, Senior Lender shall release the Award from any such event to the Borrower if and to the extent required by the terms and conditions of the Senior Loan Documents in order to

repair and restore the Premises in accordance with the terms and provisions of the Senior Loan Documents. Any portion of the Award made available to the Borrower for the repair or restoration of the Premises shall not be subject to attachment by Mezzanine Lender.

Section 10.     Rights of Subrogation; Bankruptcy.

(a)     Each of Mezzanine Lender and Senior Lender hereby waives any requirement for marshaling of assets thereby in connection with any foreclosure of any security interest or any other realization upon collateral in respect of the Senior Loan Documents or the Mezzanine Loan Documents, as applicable, or any exercise of any rights of set-off or otherwise. Each of Mezzanine Lender and Senior Lender assumes all responsibility for keeping itself informed as to the condition (financial or otherwise) of Borrower, Mezzanine Borrower, the condition of the Premises and all other collateral and other circumstances and, except for notices expressly required by this Agreement, neither Senior Lender nor Mezzanine Lender shall have any duty whatsoever to obtain, advise or deliver information or documents to the other relative to such condition, business, assets and/or operations. Mezzanine Lender agrees that Senior Lender owes no fiduciary duty to Mezzanine Lender in connection with the administration of the Senior Loan and the Senior Loan Documents and Mezzanine Lender agrees not to assert any such claim. Senior Lender agrees that Mezzanine Lender owes no fiduciary duty to Senior Lender in connection with the administration of the Mezzanine Loan and the Mezzanine Loan Documents and Senior Lender agrees not to assert any such claim.

(b)     No payment or distribution to Senior Lender pursuant to the provisions of this Agreement and no Protective Advance by Mezzanine Lender shall entitle Mezzanine Lender to exercise any right of subrogation in respect thereof prior to the payment in full of the Senior Loan Liabilities, and Mezzanine Lender agrees that, except with respect to the enforcement of its remedies under the Mezzanine Loan Documents permitted hereunder, prior to the satisfaction of all Senior Loan Liabilities it shall not acquire, by subrogation or otherwise, any lien, estate, right or other interest in any portion of the Premises or any other collateral now securing the Senior Loan or the proceeds therefrom that is or may be prior to, or of equal priority to, any of the Senior Loan Documents or the liens, rights, estates and interests created thereby.

(c)     Subject to Section 30 of this Agreement, the provisions of this Agreement shall be applicable both before and after the commencement, whether voluntary or involuntary, of any case, proceeding or other action against Borrower or any SPE Constituent Entity under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors (a "Proceeding"). For as long as the Senior Loan shall remain outstanding, Mezzanine Lender shall not, and shall not solicit any person or entity to, and shall not direct or cause Mezzanine Borrower to direct or cause either the Borrower or any entity which controls Borrower (the "Borrower Group") to: (i) commence any Proceeding; (ii) institute proceedings to have Borrower or any SPE Constituent Entity adjudicated a bankrupt or insolvent; (iii) consent to, or acquiesce in, the institution of bankruptcy or insolvency proceedings against Borrower or any SPE Constituent Entity; (iv) file a petition or consent to the filing of a petition seeking reorganization, arrangement, adjustment, winding-up, dissolution, composition, liquidation or other relief by or on behalf of Borrower or any SPE Constituent Entity; (v) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for Borrower or any SPE Constituent Entity, the Premises (or any portion thereof) or any

other collateral securing the Senior Loan (or any portion thereof); (vi) make an assignment for the benefit of any creditor of Borrower or any SPE Constituent Entity; (vii) seek to consolidate the Premises or any other assets of the Borrower or any SPE Constituent Entity with the assets of the Mezzanine Borrower or any member of the Borrower Group in any proceeding relating to bankruptcy, insolvency, reorganization or relief of debtors; or (viii) take any action in furtherance of any of the foregoing.

(d)    If Mezzanine Lender is deemed to be a creditor of Borrower or any SPE Constituent Entity in any Proceeding (i) Mezzanine Lender hereby agrees that it shall not make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Proceeding by or against the Borrower or any SPE Constituent Entity without the prior consent of Senior Lender, except to the extent necessary to preserve or realize upon Mezzanine Lender's interest in the Equity Collateral; provided, however, that any such filing shall not be as a creditor of the Borrower, (ii) Senior Lender may vote in any such Proceeding any and all claims of Mezzanine Lender, and Mezzanine Lender hereby appoints the Senior Lender as its agent, and grants to the Senior Lender an irrevocable power of attorney coupled with an interest, and its proxy, for the purpose of exercising any and all rights and taking any and all actions available to the Mezzanine Lender in connection with any case by or against the Borrower or any SPE Constituent Entity in any Proceeding, including without limitation, the right to file and/or prosecute any claims, to vote to accept or reject a plan, to make any election under Section 1111(b) of the Bankruptcy Code; provided, however, that with respect to any proposed plan of reorganization in respect of which creditors are voting, Senior Lender may vote on behalf of Mezzanine Lender only if the proposed plan would result in Senior Lender being "impaired" (as such term is defined in the United States Bankruptcy Code) and (iii) Mezzanine Lender shall not challenge the validity or amount of any claim submitted in such Proceeding by Senior Lender in good faith or any valuations of the Premises or other Senior Loan collateral submitted by Senior Lender in good faith, in such Proceeding or take any other action in such Proceeding, which is adverse to Senior Lender's enforcement of its claim or receipt of adequate protection (as that term is defined in the Bankruptcy Code).

Section 11.    Rights of Cure.

(a)    Prior to Senior Lender commencing any Enforcement Action under the Senior Loan Documents, Senior Lender shall provide written notice of the default which would permit the Senior Lender to commence such Enforcement Action to Mezzanine Lender and any Loan Pledgee entitled to notice thereof pursuant to Section 15 of this Agreement, whether or not Senior Lender is obligated to give notice thereof to Borrower (each, a "Senior Loan Default Notice") and shall permit Mezzanine Lender an opportunity to cure such default in accordance with the provisions of this Section 11(a). If the default is a monetary default relating to a liquidated sum of money, Mezzanine Lender shall have until five (5) Business Days after the later of (i) the giving by Senior Lender of the Senior Loan Default Notice and (ii) the expiration of Borrower's cure provision, if any, (a "Monetary Cure Period") to cure such monetary default; provided, however, in the event it elects to cure any such monetary default, Mezzanine Lender shall (x) defend and hold harmless Senior Lender for all cost, expenses, losses, liabilities, obligations, damages, penalties, costs, and disbursements imposed on, incurred by or asserted against Senior Lender due to or arising from such Monetary Cure Period and (y) without duplication of the foregoing, reimburse the Senior Lender for any interest charged by Senior

Lender on any required (pursuant to applicable pooling and servicing agreement) advances for monthly payments of principal and/or interest on the Senior Loan and/or on any Protective Advances. Mezzanine Lender shall not be required, in order to effect a cure hereunder (other than the cure by Mezzanine Lender of a default in the payment of the Senior Loan in full on the maturity date thereof or the reimbursement of interest on advances for monthly payment of principal and/or interest and/or on any Protective Advances, as aforesaid), to pay any interest calculated at the default rate under the Senior Loan Documents to the extent the same is in excess of the rate of interest which would have been payable by Borrower in the absence of such default (and irrespective of any cure of such default by Mezzanine Lender pursuant to the provisions of this Agreement), and no interest shall accrue at the default rate as against Mezzanine Lender for such period. Mezzanine Lender shall not have the right to cure as hereinabove set forth with respect to monthly scheduled debt service payments on the Senior Loan for a period of more than four consecutive months unless Mezzanine Lender has commenced and is continuing to diligently pursue its rights against the Separate Collateral. If the default is of a non-monetary nature, Mezzanine Lender shall have the same period of time as the Borrower under the Loan Documents to cure such non-monetary default; provided, however, if such non-monetary default is susceptible of cure but cannot reasonably be cured within such period and if curative action was promptly commenced and is being continuously and diligently pursued by Mezzanine Lender, Mezzanine Lender shall be given an additional period of time as is reasonably necessary for Mezzanine Lender in the exercise of due diligence to cure such non-monetary default for so long as (i) Mezzanine Lender makes or causes to be made timely payment of Borrower's regularly scheduled monthly principal and/or interest payments under the Senior Loan and any other amounts due under the Senior Loan Documents, (ii) such additional period of time does not exceed thirty (30) days, unless such non-monetary default is of a nature that can not be cured within such thirty (30) days, in which case, Mezzanine Lender shall have such additional time as is reasonably necessary to cure such non-monetary default, (iii) such default is not caused by a bankruptcy, insolvency or assignment for the benefit of creditors of Borrower and (iv) during such non-monetary cure period, there is no material impairment to the value, use or operation of the Premises. Any additional cure period granted to the Mezzanine Lender hereunder shall automatically terminate upon the bankruptcy (or similar insolvency) of the Borrower.

(b)     To the extent that any Qualified Transferee acquires the Equity Collateral in accordance with the provisions and conditions of this Agreement, such Qualified Transferee shall acquire the same subject to the Senior Loan and the terms, conditions and provisions of the Senior Loan Documents for the balance of the term thereof, which shall not be accelerated by Senior Lender solely due to such acquisition and shall remain in full force and effect; provided, however, that (i) such Qualified Transferee shall have caused Borrower to reaffirm in writing, subject to such exculpatory provisions as shall be set forth in the Senior Loan Documents, all of the terms, conditions and provisions of the Senior Loan Documents on Borrower's part to be performed and (ii) all defaults under the Senior Loan which remain uncured as of the date of such acquisition have been cured by such Qualified Transferee or waived by Senior Lender except for defaults that are not susceptible of being cured by such Qualified Transferee; provided, that such defaults which are not susceptible of being cured do not materially impair the value, use or operation of the Premises. Notwithstanding any contrary or inconsistent provision of this Agreement, the Senior Loan Documents or the Mezzanine Loan Documents, no acquisition or other fee or similar charge shall be due in connection with such

Qualified Transferee's acquisition of any interest in Borrower or the Premises as the result of a Equity Collateral Enforcement Action or assignment in lieu of foreclosure or other negotiated settlement in lieu of any of the foregoing.

(c)     So long as no Event of Default shall have occurred and be continuing under the Senior Loan Documents, all funds held and applied pursuant to the Senior Loan Cash Management Agreement, shall continue to be applied pursuant thereto and shall not be applied by Senior Lender to prepay outstanding principal balance of the Senior Loan.

Section 12.     <u>No Actions; Restrictive Provisions</u>.  Senior Lender consents to Mezzanine Lender's right, pursuant to the Mezzanine Loan Documents, under certain circumstances, to cause the termination of the Property Manager.  In the event both Mezzanine Lender and Senior Lender shall have such rights at any time, and Senior Lender shall fail to exercise such rights, Mezzanine Lender may exercise such rights, provided such exercise may be superseded by any subsequent exercise of such rights by Senior Lender pursuant to the Senior Loan Documents. Upon the occurrence of any event which would entitle Mezzanine Lender to cause the termination of the Property Manager pursuant to the Mezzanine Loan Documents, Mezzanine Lender shall have the right to select, or cause the selection, of a replacement property manager (including any asset manager) or leasing agent for the Premises, which replacement manager, asset manager and/or leasing agent shall either (a) be subject to Senior Lender's reasonable approval and, if any Certificates are then outstanding, be subject to a Rating Agency Confirmation or (b) be a Qualified Manager.  Notwithstanding anything in this <u>Section 12</u> to the contrary, if an Event of Default under the Senior Loan then exists or any other event shall have occurred pursuant to which Senior Lender has the right to select any replacement manager, asset manager and/or leasing agent pursuant to the Senior Loan Documents, Senior Lender shall have the sole right to select any replacement manager, asset manager and/or leasing agent, whether or not a new manager or agent was retained by Mezzanine Lender.

Section 13.     <u>Right to Purchase Senior Loan</u>.

(a)     If the Senior Loan has been accelerated, any Enforcement Action has been commenced and is continuing under the Senior Loan Documents or the Senior Loan is a "specially serviced mortgage loan" under the applicable pooling and servicing agreement (each of the foregoing, a "<u>Purchase Option Event</u>"), upon ten (10) Business Days prior written notice to Senior Lender (the "<u>Purchase Notice</u>"), Mezzanine Lender shall have the right to purchase, in whole but not in part, the Senior Loan for a price equal to the outstanding principal balance thereof, together with all accrued interest and other amounts due thereon (including, without limitation, any late charges, default interest, exit fees, advances and post-petition interest), any Protective Advances made by Senior Lender and any interest charged by Senior Lender on any advances for monthly payments of principal and/or interest on the Senior Loan and/or on any Protective Advances), including all costs and expenses (including legal fees and expenses) actually incurred by Senior Lender in enforcing the terms of the Loan Documents (the "<u>Loan Purchase Price</u>").  Concurrently with payment to the Senior Lender of the Loan Purchase Price, Senior Lender shall deliver or cause to be delivered Mezzanine Lender all Senior Loan Documents held by or on behalf of Senior Lender and will execute in favor of Mezzanine Lender or its designee assignment documentation, in form and substance reasonably acceptable to Mezzanine Lender, at the sole cost and expense of Mezzanine Lender to assign the Senior Loan

and its rights under the Senior Loan Documents (without recourse, representations or warranties, except for representations as to the outstanding balance of the Senior Loan and as to Senior Lender's not having assigned or encumbered its rights in the Loan). The right of Mezzanine Lender to purchase the Senior Loan shall automatically terminate (i) upon a transfer of the Premises by foreclosure sale, sale by power of sale or delivery of a deed in lieu of foreclosure or (ii) if a Purchase Option Event ceases to exist.

(b)    Mezzanine Lender covenants not to enter any agreement with the Borrower or any Affiliate thereof to purchase the Senior Loan pursuant to subsection (a) above or in connection with any refinancing of the Senior Loan in any manner designed to avoid or circumvent the provisions of the Senior Loan Documents which require the payment of a prepayment fee or yield maintenance charge in connection with a prepayment of the Senior Loan by the Borrower.

Section 14.    Additional Understandings. For as long as the Mezzanine Loan remains outstanding:

(a)    Notices of Transfer; Consent. Senior Lender promptly shall notify Mezzanine Lender if Borrower seeks or requests a release of the lien of the Senior Loan or seeks or requests Senior Lender's consent to, or take any action in connection with or in furtherance of, a sale or transfer of all or any material portion of the Premises, the granting of a further mortgage, deed of trust or similar encumbrance against the Premises or a prepayment or refinancing of the Senior Loan. In the event of a request by the Borrower for Senior Lender's consent to either (i) the sale or transfer of all or any material portion of the Premises or (ii) the granting of a further mortgage, deed of trust or similar encumbrance against the Premises, Senior Lender shall, if Senior Lender has the right to consent, obtain the prior written consent of Mezzanine Lender prior to Senior Lender's granting of its consent or agreement thereto.

(b)    Annual Budget. The Mezzanine Lender shall have the right to approve the annual operating budget of Borrower in accordance with the terms of the Mezzanine Loan Documents. Notwithstanding anything contained herein, in the Senior Loan Documents or in the Mezzanine Loan Documents, the Mezzanine Lender may require Borrower to submit the annual budget to the Mezzanine Lender for approval prior to any submission to the Senior Lender. Upon Mezzanine Lender's approval, the Mezzanine Lender shall submit the approved budget to the Senior Lender for its approval. The Mezzanine Lender shall consent to any changes in the budget reasonably requested by the Senior Lender. In the event that the approval of the Mezzanine Lender is not obtained on a timely basis, the then current existing operating budget shall remain in effect with an increase in any non-discretionary expense item to either (i) the prior budgeted expense amount with a 5% increase or (ii) the actual expense incurred as evidenced by the applicable bill or invoice.

Section 15.    Financing of Mezzanine Loan. Notwithstanding any other provision hereof, Senior Lender consents to Mezzanine Lender's pledge (a "Pledge") of the Mezzanine Loan and of the Separate Collateral to any entity which has extended a credit facility to Mezzanine Lender that is a Qualified Transferee or a financial institution whose long-term unsecured debt is rated at least "A" (or the equivalent) or better by each Rating Agency (a "Loan Pledgee"), on the terms and conditions set forth in this Section 15; provided that a Loan Pledgee

which is not a Qualified Transferee may not take title to the Equity Collateral without a Rating Agency Confirmation. Upon written notice by Mezzanine Lender to Senior Lender that the Pledge has been effected, Senior Lender agrees to acknowledge receipt of such notice and thereafter agrees: (a) to give Loan Pledgee written notice of any default by Mezzanine Lender under this Agreement of which default Senior Lender has actual knowledge; (b) to allow Loan Pledgee a period of ten (10) days (in respect of a monetary default) and a period of thirty (30) days (in respect of a non-monetary default) to cure a default by Mezzanine Lender in respect of its obligations to Senior Lender hereunder, but Loan Pledgee shall not be obligated to cure any such default; (c) that no amendment, modification, waiver or termination of this Agreement shall be effective against Loan Pledgee without the written consent of Loan Pledgee, which consent shall not be unreasonably withheld; (d) that Senior Lender shall give to Loan Pledgee copies of any Senior Loan Default Notice simultaneously with the giving of same to the Mezzanine Lender and accept any cure thereof by Loan Pledgee made in accordance with the provisions of <u>Section 11</u> of this Agreement as if such cure were made by the Mezzanine Lender; and (e) that, upon written notice (a "<u>Redirection Notice</u>") to Senior Lender by Loan Pledgee that Mezzanine Lender is in default, beyond applicable cure periods, under Mezzanine Lender's obligations to Loan Pledgee pursuant to the applicable credit agreement between Mezzanine Lender and Loan Pledgee (which notice need not be joined in or confirmed by Mezzanine Lender), and until such Redirection Notice is withdrawn or rescinded by Loan Pledgee, Senior Lender shall remit to Loan Pledgee and not to Mezzanine Lender, any payments that Senior Lender would otherwise be obligated to pay to Mezzanine Lender from time to time pursuant to this Agreement, any Mezzanine Loan Document or any other agreement between Senior Lender and Mezzanine Lender that relates to the Senior Loan. Mezzanine Lender hereby unconditionally and absolutely releases Senior Lender from any liability to Mezzanine Lender on account of Senior Lender's compliance with any Redirection Notice believed by Senior Lender to have been delivered by Loan Pledgee. Loan Pledgee shall be permitted to fully exercise its rights and remedies against Mezzanine Lender, and realize on any and all collateral granted by Mezzanine Lender to Loan Pledgee (and accept an assignment in lieu of foreclosure as to such collateral), in accordance with applicable law. In such event, the Senior Lender shall recognize Loan Pledgee (and any transferee which is also a Qualified Transferee at any foreclosure or similar sale held by Loan Pledgee or any transfer in lieu of such foreclosure), and its successors and assigns, as the successor to Mezzanine Lender's rights, remedies and obligations under this Agreement and the Mezzanine Loan Documents and any such Loan Pledgee or Qualified Transferee shall assume in the writing the obligations of the Mezzanine Lender hereunder accruing from and after such Transfer and agrees to be bound by the terms and provisions hereof. The rights of Loan Pledgee under this <u>Section 15</u> shall remain effective unless and until Loan Pledgee shall have notified the Senior Lender in writing that its interest in the Mezzanine Loan has terminated.

Section 16.     <u>Intentionally Omitted</u>.

Section 17.     <u>Obligations Hereunder Not Affected</u>.

(a)     All rights, interests, agreements and obligations of Senior Lender and Mezzanine Lender under this Agreement shall remain in full force and effect irrespective of:

(i)      any lack of validity or enforceability of the Senior Loan Documents or the Mezzanine Loan Documents or any other agreement or instrument relating thereto;

(ii)      any taking, exchange, release or non-perfection of any other collateral, or any taking, release or amendment or waiver of or consent to or departure from any guaranty, for all or any portion of the Senior Loan or the Mezzanine Loan;

(iii)      any manner of application of collateral, or proceeds thereof, to all or any portion of the Senior Loan or the Mezzanine Loan, or any manner of sale or other disposition of any collateral for all or any portion of the Senior Loan or the Mezzanine Loan or any other assets of Borrower or Mezzanine Borrower or any other Affiliates of Borrower;

(iv)      any change, restructuring or termination of the corporate structure or existence of Borrower or Mezzanine Borrower or any other Affiliates of Borrower; or

(v)      any other circumstance which might otherwise constitute a defense available to, or a discharge of, Borrower, Mezzanine Borrower or a subordinated creditor or a Senior Lender subject to the terms hereof.

(b)      This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of all or any portion of the Senior Loan is rescinded or must otherwise be returned by Senior Lender or Mezzanine Lender upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, all as though such payment had not been made.

Section 18.    Notices. All notices, demands, requests, consents, approvals or other communications required, permitted, or desired to be given hereunder shall be in writing sent by facsimile (with answer back acknowledged) or by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this Section 18. Any such notice, demand, request, consent, approval or other communication shall be deemed to have been received: (a) three (3) Business Days after the date mailed, (b) on the date of sending by facsimile if sent during business hours on a Business Day (otherwise on the next Business Day), (c) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day) and (d) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

To Mezzanine Lender:

Morgan Stanley Mortgage Capital Inc.
1221 Avenue of the Americas
27th Floor
New York, New York  10020
Attention:  Stephen Holmes

Section 19.     Estoppel.

(a)     Mezzanine Lender shall, within ten (10) days following a request from Senior Lender, provide Senior Lender with a written statement setting forth the then current outstanding principal balance of the Mezzanine Loan, the aggregate accrued and unpaid interest under the Mezzanine Loan, and stating whether to Mezzanine Lender's knowledge any default or Event of Default exists under the Mezzanine Loan.

(b)     Senior Lender shall, within ten (10) days following a request from Mezzanine Lender, provide Mezzanine Lender with a written statement setting forth the then current outstanding principal balance of the Senior Loan, the aggregate accrued and unpaid interest under the Senior Loan, and stating whether to Senior Lender's knowledge any default or Event of Default exists under the Senior Loan.

Section 20.     Further Assurances.  So long as all or any portion of the Senior Loan and the Mezzanine Loan remains unpaid and the Senior Mortgage encumbers the Premises, Mezzanine Lender and Senior Lender will each execute, acknowledge and deliver in recordable form and upon demand of the other, any other instruments or agreements reasonably required in order to carry out the provisions of this Agreement or to effectuate the intent and purposes hereof.

Section 21.     No Third Party Beneficiaries; No Modification.  The parties hereto do not intend the benefits of this Agreement to inure to Borrower, Mezzanine Borrower or any other Person. This Agreement may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any change is sought.  If any Certificates are outstanding, this Agreement shall not be amended unless a Rating Agency Confirmation has been obtained with respect to such amendment.

Section 22.     Successors and Assigns.  This Agreement shall bind all successors and permitted assigns of Mezzanine Lender and Senior Lender and shall inure to the benefit of all successors and permitted assigns of Senior Lender and Mezzanine Lender.

Section 23.     Counterpart Originals.  This Agreement may be executed in counterpart originals, each of which shall constitute an original, and all of which together shall constitute one and the same agreement.

Section 24.     Legal Construction.  In all respects, including, without limitation, matters of construction and performance of this Agreement and the obligations arising hereunder, this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York applicable to agreements intended to be wholly performed within the State of New York.

Section 25.     No Waiver; Remedies.  No failure on the part of the Senior Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise

thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 26.    No Joint Venture.  Nothing provided herein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between or among any of the parties hereto.

Section 27.    Captions.  The captions in this Agreement are inserted only as a matter of convenience and for reference, and are not and shall not be deemed to be a part hereof.

Section 28.    Conflicts.  In the event of any conflict, ambiguity or inconsistency between the terms and conditions of this Agreement and the terms and conditions of any of the Senior Loan Documents or the Mezzanine Loan Documents, the terms and conditions of this Agreement shall control.

Section 29.    No Release.  Nothing herein contained shall operate to release Borrower from (a) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Senior Loan Documents or (b) any liability of Borrower under the Senior Loan Documents or to release Mezzanine Borrower from (x) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Mezzanine Loan Documents or (y) any liability of Mezzanine Borrower under the Mezzanine Loan Documents.

Section 30.    Continuing Agreement.  This Agreement is a continuing agreement and shall remain in full force and effect until the earliest of (a) payment in full of the Senior Loan, (b) transfer of the Premises by foreclosure of the Senior Mortgage or the exercise of the power of sale contained therein or by deed-in-lieu of foreclosure, (c) transfer of title to the Mezzanine Lender of the Separate Collateral or (d) payment in full of the Mezzanine Loan; provided, however, that any rights or remedies of either party hereto arising out of any breach of any provision hereof occurring prior to such date of termination shall survive such termination.

Section 31.    Severability.  In the event that any provision of this Agreement or the application hereof to any party hereto shall, to any extent, be invalid or unenforceable under any applicable statute, regulation, or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute, regulation or rule of law, and the remainder of this Agreement and the application of any such invalid or unenforceable provisions to parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall same affect the validity or enforceability of any other provision of this Agreement.

Section 32.    Expenses.

(a)    To the extent not paid by Borrower or out of or from any collateral securing the Senior Loan which is realized by Senior Lender, Mezzanine Lender agrees upon demand to pay to Senior Lender the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Senior Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Senior Lender against Mezzanine Lender hereunder to the extent that Senior Lender is

the prevailing party in any dispute with respect thereto or (ii) failure by Mezzanine Lender to perform or observe any of the provisions hereof.

(b)     To the extent not paid by Mezzanine Borrower out of or from any collateral securing the Mezzanine Loan which is realized by Mezzanine Lender, Senior Lender agrees upon demand to pay to Mezzanine Lender the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Mezzanine Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Mezzanine Lender against Senior Lender hereunder to the extent that Mezzanine Lender is the prevailing party in any dispute with respect thereto or (ii) failure by Senior Lender to perform or observe any of the provisions hereof.

Section 33.     Injunction.  Senior Lender and Mezzanine Lender each acknowledge (and waive any defense based on a claim) that monetary damages are not an adequate remedy to redress a breach by the other hereunder and that a breach by either Senior Lender or Mezzanine Lender hereunder would cause irreparable harm to the other.  Accordingly, Senior Lender and Mezzanine Lender agree that upon a breach of this Agreement by the other, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

Section 34.     Mutual Disclaimer.

(a)     Each of Senior Lender and Mezzanine Lender are sophisticated lenders and/or investors in real estate and their respective decision to enter into the Senior Loan and the Mezzanine Loan is based upon their own independent expert evaluation of the terms, covenants, conditions and provisions of, respectively, the Senior Loan Documents and the Mezzanine Loan Documents and such other matters, materials and market conditions and criteria which each of Senior Lender and Mezzanine Lender deem relevant.  Each of Senior Lender and Mezzanine Lender has not relied in entering into this Agreement, and respectively, the Senior Loan, the Senior Loan Documents, the Mezzanine Loan or the Mezzanine Loan Documents, upon any oral or written information, representation, warranty or covenant from the other, or any of the other's representatives, employees, Affiliates or agents other than the representations and warranties of the other contained herein.  Each of Senior Lender and Mezzanine Lender further acknowledges that no employee, agent or representative of the other has been authorized to make, and that each of Senior Lender and Mezzanine Lender have not relied upon, any statements, representations, warranties or covenants other than those specifically contained in this Agreement.  Without limiting the foregoing, each of Senior Lender and Mezzanine Lender acknowledges that the other has made no representations or warranties as to the Senior Loan or the Mezzanine Loan or the Premises (including, without limitation, the cash flow of the Premises, the value, marketability, condition or future performance thereof, the existence, status, adequacy or sufficiency of the leases, the tenancies or occupancies of the Premises, or the sufficiency of the cash flow of the Premises, to pay all amounts which may become due from time to time pursuant to the Senior Loan or the Mezzanine Loan).

(b)     Each of Senior Lender and Mezzanine Lender acknowledges that the Senior Loan and the Mezzanine Loan Documents are distinct, separate transactions and loans, separate and apart from each other.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, Senior Lender and Mezzanine Lender have executed this Agreement as of the date and year first set forth above.

SENIOR LENDER:

MORGAN STANLEY MORTGAGE CAPITAL INC., a New York corporation

By:
Name:
Title:

CYNTHIA ECKES
VICE PRESIDENT

MEZZANINE LENDER:

MORGAN STANLEY MORTGAGE CAPITAL INC., a New York corporation

By:
Name:
Title:

CYNTHIA ECKES
VICE PRESIDENT

EXHIBIT A

[ATTACH LEGAL DESCRIPTION OF PREMISES]

EXHIBIT B

Senior Loan Documents

*All Senior Loan Documents are dated July 18, 2006, unless otherwise stated below*

1.  Loan Agreement between Borrower and Senior Lender;
2.  First Amendment to Loan Agreement between Borrower and Senior Lender dated August 3, 2006;
3.  Promissory Note made by Borrower to Senior Lender in the original principal amount of $28,500,000;
4.  Mortgage and Security Agreement given by Borrower to Senior Lender;
5.  Assignment of Leases and Rents made by Borrower in favor of Senior Lender;
6.  Environmental Indemnity Agreement made by Borrower and Matthew Studer, Fred Graft, Ernie Malas and Peter Coratola, individually and collectively ("Guarantor") for the benefit of Senior Lender;
7.  Guaranty of Payment and Guaranty of Recourse Obligations made by Guarantor for the benefit of Senior Lender in connection with certain obligations under the Senior Loan;
8.  Conditional Assignment of Management Agreement by Borrower in favor of Senior Lender, as agreed to by FOCUS LODGING GROUP, LLC, an Ohio limited liability company (the "Manager");
9.  Authorization to Wire Funds executed by Borrower;
10. Borrower's Closing Certificate executed by Borrower;
11. Borrower's Certification executed by Borrower;
12. Title Escrow Instruction Letter acknowledged and agreed to by Borrower and the title company described therein;
13. Post Closing Agreement executed by Borrower;
14. Cash Management Agreement executed by Borrower, Senior Lender and the Manager dated August 3, 2006; and
15. Restricted Account Agreement executed by Borrower, Senior Lender and JPMorgan Chase Bank, N.A. dated August 3, 2006.

11368147.1.BUSINESS LEGAL02/30017356v5

EXHIBIT C

Mezzanine Loan Documents

*All Mezzanine Loan Documents are dated August 3, 2006*

1.  Loan Agreement between Mezzanine Borrower and Mezzanine Lender;
2.  Promissory Note made by Mezzanine Borrower to Mezzanine Lender in the original principal amount of $10,500,000;
3.  Pledge and Security Agreement given by Mezzanine Borrower to Mezzanine Lender;
4.  Environmental Indemnity Agreement made by Mezzanine Borrower and Matthew Studer, Fred Graft, Ernie Malas and Peter Coratola, individually and collectively ("Guarantor") for the benefit of Mezzanine Lender;
5.  Guaranty of Payment and Guaranty of Recourse Obligations made by Guarantor for the benefit of Mezzanine Lender in connection with certain obligations under the Mezzanine Loan;
6.  Conditional Assignment of Management Agreement by Borrower, Mezzanine Borrower in favor of Senior Lender, as agreed to by FOCUS LODGING GROUP, LLC, an Ohio limited liability company (the "Manager");
7.  Borrower's Certification executed by Mezzanine Borrower; and
8.  Title Escrow Instruction Letter acknowledged and agreed to by Mezzanine Borrower and the title company described therein.

LEGAL02/30017356v5

## ASSIGNMENT AND ASSUMPTION AGREEMENT

### (Intercreditor Agreement)

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made as of the 5th day of December, 2006, among MORGAN STANLEY MORTGAGE CAPITAL INC., a New York corporation ("Prior Mezzanine Lender"), and HFT RE CDO 2006-2, LTD., a Cayman Islands limited liability company ("Mezzanine Lender").

RECITALS

A.     WHEREAS, pursuant to a certain Loan Agreement, dated as of July 18, 2006 (as amended, supplemented or otherwise modified from time to time, the "Mortgage Loan Agreement"), Morgan Stanley Mortgage Capital Inc., a New York corporation, as mortgage lender ("Original Mortgage Lender"), has made a loan in the principal amount of $24,500,000.00 (the "Mortgage Loan") to PLATINUM LODGING, LLC, an Ohio limited liability company (the "Mortgage Borrower") which Mortgage Loan has been assigned by Original Mortgage Lender to Wells Fargo Bank, National Association, as Trustee for the certificateholders of the Morgan Stanley Capital I Inc. Commercial Mortgage Pass Through Certificate Series 2006-XLF ("Mortgage Lender"); and

B.     WHEREAS, pursuant to a certain Mezzanine Loan Agreement, dated as of August 3, 2006 (as amended, supplemented or otherwise modified from time to time, the "Mezzanine Loan Agreement"), Prior Mezzanine Lender has made a loan in the original principal amount of $10,500,000.00 (the "Mezzanine Loan") to PLATINUM LODGING MEZZ, LLC, an Ohio limited liability company (the "Mezzanine Borrower"); and

C.     WHEREAS, Mortgage Lender and Prior Mezzanine Lender have made and entered into that certain Intercreditor Agreement, dated as of August 3, 2006 (the "Intercreditor Agreement"), wherein Mortgage Lender gave its consent to Prior Mezzanine Lender to the making of the Mezzanine Loan, subject to, and in accordance with, the terms of the Intercreditor Agreement; and

D.     WHEREAS, pursuant to that certain Omnibus Assignment and Assumption Agreement, dated as of the date hereof (the "Assignment"), Prior Mezzanine Lender has assigned all its right, title and interest in and to the Mezzanine Loan and the Loan Documents (as such term is defined in the Assignment) to Mezzanine Lender, including without limitation, the Intercreditor Agreement;

E.     WHEREAS, Mezzanine Lender is willing to accept the assignment and assume the various obligations and liabilities contained in the Intercreditor Agreement.

NOW, THEREFORE, in consideration of the covenants, agreements, representations and/or warranties of Prior Mezzanine Lender and Mezzanine Lender set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of Prior Mezzanine Lender and Mezzanine Lender, Prior Mezzanine Lender and Mezzanine Lender do hereby agree as follows:

LEGAL02/30160429v4

1.      Defined terms are indicated herein by initial capital letters. Initially capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Intercreditor Agreement.

2.      Prior Mezzanine Lender hereby assigns all of its right, title and interest in and to the Intercreditor Agreement to Mezzanine Lender.

3.      Except as amended, modified, changed and/or supplemented by this Agreement, the Intercreditor Agreement (i) remains unchanged, (ii) is hereby ratified and confirmed by Mezzanine Lender and (iii) shall continue in full force and effect in accordance with, but subject to, its terms.

4.      Prior Mezzanine Lender hereby remakes each of the representations and warranties set forth in Section 3 of the Intercreditor Agreement made for the benefit of Mortgage Lender under the Intercreditor Agreement to and for the benefit of Mezzanine Lender as of the date hereof.

5.      Mezzanine Lender hereby remakes, for the benefit of Mortgage Lender, each of the representations and warranties set forth in the Intercreditor Agreement to the same extent and with the same force as if fully set forth herein as required pursuant to Section 4(a) thereof.  Future assignments of the Mezzanine Loan shall be in accordance with, and subject to, the terms of the Intercreditor Agreement.

6.      Mezzanine Lender hereby accepts the foregoing assignment of the Intercreditor Agreement and hereby assumes and agrees to fulfill, perform and discharge, from and after the date hereof, all of the various commitments, obligations and liabilities of Prior Mezzanine Lender under the Intercreditor Agreement accruing solely from and after the date hereof.

7.      Except as otherwise set forth herein and in the Assignment, this assignment is made without representation or warranty, express or implied and without recourse to the Prior Mezzanine Lender in any manner whatsoever.

8.      This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.  Future assignments of the Mezzanine Loan shall be in accordance with the terms of the Intercreditor Agreement.

9.      This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, together, shall be deemed one agreement.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to by duly executed as of the __5th__ day of December, 2006.

PRIOR MEZZANINE LENDER:

MORGAN STANLEY MORTGAGE
CAPITAL INC., a New York corporation

By: _____

Name:
Title:          Steven R. Maeglin
                Vice President

[SIGNATURE PAGES CONTINUE ON FOLLOWING PAGE]

Signature Page to Assignment and Assumption Agreement

**MEZZANINE LENDER:**

HFT RE CDO 2006-2, LTD., a Cayman Islands
limited liability company

By: Highland Capital Management, L.P., as
Servicer

By: Strand Advisors, Inc., its General
Partner

By: _____
Name:
Title:
Brian Lohrding, Treasurer
Strand Advisors, Inc.,
General Partner of
Highland Capital Management, L.P.

Signature Page to Assignment and Assumption Agreement (Intercreditor)

MSMCI Loan No.: 06-26034

## ASSIGNMENT AND ASSUMPTION AGREEMENT

### (Intercreditor Agreement)

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made as of the 5th day of December, 2006, among MORGAN STANLEY MORTGAGE CAPITAL INC., a New York corporation ("Prior Mezzanine Lender"), and HFT RE CDO 2006-2, LTD., a Cayman Islands limited liability company ("Mezzanine Lender").

RECITALS

A.    WHEREAS, pursuant to a certain Loan Agreement, dated as of July 18, 2006 (as amended, supplemented or otherwise modified from time to time, the "Mortgage Loan Agreement"), Morgan Stanley Mortgage Capital Inc., a New York corporation, as mortgage lender ("Original Mortgage Lender"), has made a loan in the principal amount of $24,500,000.00 (the "Mortgage Loan") to PLATINUM LODGING, LLC, an Ohio limited liability company (the "Mortgage Borrower") which Mortgage Loan has been assigned by Original Mortgage Lender to Wells Fargo Bank, National Association, as Trustee for the certificateholders of the Morgan Stanley Capital I Inc. Commercial Mortgage Pass Through Certificate Series 2006-XLF ("Mortgage Lender"); and

B.    WHEREAS, pursuant to a certain Mezzanine Loan Agreement, dated as of August 3, 2006 (as amended, supplemented or otherwise modified from time to time, the "Mezzanine Loan Agreement"), Prior Mezzanine Lender has made a loan in the original principal amount of $10,500,000.00 (the "Mezzanine Loan") to PLATINUM LODGING MEZZ, LLC, an Ohio limited liability company (the "Mezzanine Borrower"); and

C.    WHEREAS, Mortgage Lender and Prior Mezzanine Lender have made and entered into that certain Intercreditor Agreement, dated as of August 3, 2006 (the "Intercreditor Agreement"), wherein Mortgage Lender gave its consent to Prior Mezzanine Lender to the making of the Mezzanine Loan, subject to, and in accordance with, the terms of the Intercreditor Agreement; and

D.    WHEREAS, pursuant to that certain Omnibus Assignment and Assumption Agreement, dated as of the date hereof (the "Assignment"), Prior Mezzanine Lender has assigned all its right, title and interest in and to the Mezzanine Loan and the Loan Documents (as such term is defined in the Assignment) to Mezzanine Lender, including without limitation, the Intercreditor Agreement;

E.    WHEREAS, Mezzanine Lender is willing to accept the assignment and assume the various obligations and liabilities contained in the Intercreditor Agreement.

NOW, THEREFORE, in consideration of the covenants, agreements, representations and/or warranties of Prior Mezzanine Lender and Mezzanine Lender set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of Prior Mezzanine Lender and Mezzanine Lender, Prior Mezzanine Lender and Mezzanine Lender do hereby agree as follows:

1.    Defined terms are indicated herein by initial capital letters. Initially capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Intercreditor Agreement.

2.    Prior Mezzanine Lender hereby assigns all of its right, title and interest in and to the Intercreditor Agreement to Mezzanine Lender.

3.    Except as amended, modified, changed and/or supplemented by this Agreement, the Intercreditor Agreement (i) remains unchanged, (ii) is hereby ratified and confirmed by Mezzanine Lender and (iii) shall continue in full force and effect in accordance with, but subject to, its terms.

4.    Prior Mezzanine Lender hereby remakes each of the representations and warranties set forth in Section 3 of the Intercreditor Agreement made for the benefit of Mortgage Lender under the Intercreditor Agreement to and for the benefit of Mezzanine Lender as of the date hereof.

5.    Mezzanine Lender hereby remakes, for the benefit of Mortgage Lender, each of the representations and warranties set forth in the Intercreditor Agreement to the same extent and with the same force as if fully set forth herein as required pursuant to Section 4(a) thereof.  Future assignments of the Mezzanine Loan shall be in accordance with, and subject to, the terms of the Intercreditor Agreement.

6.    Mezzanine Lender hereby accepts the foregoing assignment of the Intercreditor Agreement and hereby assumes and agrees to fulfill, perform and discharge, from and after the date hereof, all of the various commitments, obligations and liabilities of Prior Mezzanine Lender under the Intercreditor Agreement accruing solely from and after the date hereof.

7.    Except as otherwise set forth herein and in the Assignment, this assignment is made without representation or warranty, express or implied and without recourse to the Prior Mezzanine Lender in any manner whatsoever.

8.    This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.  Future assignments of the Mezzanine Loan shall be in accordance with the terms of the Intercreditor Agreement.

9.    This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, together, shall be deemed one agreement.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to by duly executed as of the 5th day of December, 2006.

PRIOR MEZZANINE LENDER:

MORGAN STANLEY MORTGAGE
CAPITAL INC., a New York corporation

By: _____
Name:
Title:              Steven R. Maeglin
                     Vice President

[SIGNATURE PAGES CONTINUE ON FOLLOWING PAGE]

Signature Page to Assignment and Assumption Agreement

**MEZZANINE LENDER:**

HFT RE CDO 2006-2, LTD., a Cayman Islands
limited liability company

By: Highland Capital Management, L.P., as
Servicer

    By: Strand Advisors, Inc., its General
       Partner

    By: _____
    Name:
    Title:
        Brian Lohrding, Treasurer
        Strand Advisors, Inc.,
        General Partner of
        Highland Capital Management, L.P.

Signature Page to Assignment and Assumption Agreement (Intercreditor)